**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

In the Matter of

DALIA GENGER, trustee of the ORLY GENGER 1993
TRUST,

       Petitoner,

         - against -

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW
TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

       Respondents.

FILE NO.   2008-0017

## AFFIRMATION OF MARK S. HIRSCH
## IN SUPPORT OF MOTION TO DISMISS

     Mark S. Hirsch, an attorney duly admitted to practice law in the State of New

York, hereby affirms under penalty of perjury pursuant to CPLR 2106 as follows:

     1.     I am a member of the bar of the State of New York.  I make this

affirmation in support of the motion to dismiss filed by Glenclova Investment Co., TR

Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources

LLC.[1]  I am fully familiar with the matters set forth in this affirmation.

---

[1]   While the petition and citation lists Trans-Resources, Inc. as a Respondent, no such entity exists.
Rather, in June 2013, Trans-Resources, Inc. converted into a limited liability company named Trans-
Resources, LLC. *See infra* ¶ 5.

2.      I am Executive Vice President and General Counsel of Creative Worldwide Management, LLC ("CWM"), which maintains offices at 400 Park Avenue, 19th Floor, New York, New York 10022 ("CWM's Offices").

3.      I also serve as Executive Vice President and General Counsel for each of Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources LLC (the "TR Entities"). None of the TR Entities maintain an office in New York State. As a consequence, none of the TR Entities share office space with CWM or at CWM's Offices. Moreover, CWM is not a member of any of the TR Entities.

4.      Four of the five TR Entities (TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources LLC) are limited liability companies. Only Glenclova Investment Co., is a corporation. Glenclova is incorporated under the laws of the Cayman Islands and has its principal offices in the Cayman Islands.

5.      There is no existing corporation known as Trans-Resources, Inc. It was converted into Trans-Resources, LLC in June 2013, and is a limited liability company created under the laws of Delaware, and has its principal offices in Florida.

6.      On January 5, 2018, several copies of the attached citation were purportedly left at CWM's Offices. None of those copies contained any attachments, such as the petition that I understand is underlying this action. In addition, none of those copies were left with me. Rather, those copies were left with CWM's administrative assistant, Ms. Tatiana Selca, who is not authorized to receive process for CWM (which is not a party to any Genger-related action) or for any of the TR Entities (which, again, do not maintain an office in New York).

2

7.      CWM's administrative assistant, Ms. Tatiana Selca, is not an employee of any of the TR Entities and does not work in any of the principal offices for any of the TR Entities.

I affirm under penalty of perjury that the foregoing is true and correct.  Executed on February 5, 2018 in New York, New York.

_____
Mark S. Hirsch

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In The Matter of DALIA GENGER, Trustee of          File No. 2008-0017/E
the ORLY GENGER 1993 TRUST,                        :

                                                   Hon. Nora S. Anderson
                        Petitioner,                :

        - against -                                :

ORLY GENGER, ARIE GENGER,                          :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I,                :
LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER,                    :
DAVID BROSER, JOHN DOES 1-20, and
JANE DOES 1-20,                                    :

                        Respondents.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )


        Julie M. Thaxton, being duly sworn, deposes and says:

        1.  That deponent is over eighteen years of age, not a party to the action

and is employed by Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036.

        2.  That on the 6th day of February 2018, deponent served a true copy of

the

- *Notice of Motion,*

- *Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the
  Petition For Turnover of Trust Property and Other Relief with the annexed
  Exhibits A-L,*

- *Affirmation of Mark S. Hirsch in Support of Motion to Dismiss and*

- *Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief Filed on June 14, 2016, by Dalia Genger as Trustee of the Orly Genger 1993 Trust*

by Federal Express, overnight delivery upon:

> Judith Lisa Bachman, Esq.
> 254 S. Main Street, Suite 306
> New City, New York 10956
>
> Kelley Drye & Warren LLP
> John Dellaportas
> 101 Park Avenue
> New York, NY 10178
>
> Kasowitz Benson Torres LLP
> Michael Paul Bowen
> 1633 Broadway
> New York, NY 10019
>
> Steven Riker, Esq.
> One Grand Central Place, 46th Floor
> New York, NY 10165

_____
Julie M. Thaxton

Sworn to before me this
6th day of February 2018.

_____
Matthew Koenig
Notary Public, State of New York
Reg. No. 01KO6211943
Qualified in New York County
Commission Expires Sept. 23, 2021

File No. 2008-0017/E

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of DALIA GENGER, trustee of the ORLY GENGER 1993
TRUST,

Petitioner,

-against-

ORLY GENGER, ARIE GENGER, GLENCLOVA INVESTMENT
COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR
EQUITY II, LLC, TRANS-RESOURCES, INC., ARNOLD BROSER, DAVID
BROSER, JOHN DOES 1-20, and JANE DOES 1-20,

Respondents.

**AFFIRMATION OF MARK S. HIRSCH IN SUPPORT
OF MOTION TO DISMISS**

Skadden, Arps, Slate, Meagher & Flom LLP

ATTORNEYS FOR GLENCLOVA INVESTMENT CO., TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES LLC.

FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 735-3000

**SURROGATE'S COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| In the Matter of DALIA GENGER, trustee of the ORLY GENGER 1993 TRUST,<br><br>        Petitioner,<br><br>        - against -<br><br>ORLY GENGER, ARIE GENGER, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC., ARNOLD BROSER, DAVID BROSER, JOHN DOES 1-20, and JANE DOES 1-20,<br><br>        Respondents. | FILE NO.    2008-0017/E<br><br>Hon. Nora S. Anderson<br><br>**AFFIRMATION OF JOHN BOYLE IN SUPPORT OF THE TR ENTITIES' MOTION TO DISMISS THE PETITION FOR TURNOVER OF TRUST PROPERTY AND OTHER RELIEF** |

I, John Boyle, an attorney duly admitted to practice before the courts of the State of New York, hereby affirm, under CPLR 2106, the following under penalty of perjury:

        1.      I am an attorney admitted to practice before the courts of the State of New York and counsel at Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for Respondents Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources LLC, in the above-captioned proceeding.

        2.      I submit this Affirmation in support of Respondent's Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief.  I am familiar with the facts and circumstances of this proceeding by virtue of my personal involvement in it and a review of the case files, and the information provided herein is true and correct to the best of my knowledge, information, and belief.

3.      Attached as **Exhibit A** is a true and correct copy of the Petition for Turnover and Other Relief filed in this proceeding by Dalia Genger as trustee of the Orly Genger 1993 Trust.

4.      Attached as **Exhibit B** is a true and correct copy of the Decision of Justice Cooper, dated June 3, 2016 in *Genger v. Genger*, Index No. 302436/2002 (Sup. Ct. N.Y. Cty).

5.      Attached as **Exhibit C** is a true and correct copy of this Court's June 21, 2017 decision in *In re Orly Genger*, File No. 2008-0017 (Surr. Ct. N.Y. Cty), denying Dalia Genger's motion to dismiss Orly Genger's application to remove Dalia Genger as trustee of the Orly Genger 1993 Trust.

6.      Attached as **Exhibit D** is a true and correct copy of the Second Amended Stipulation of Discontinuance (the "NY Dismissal with Prejudice") [Dkt. #487], dated July 1, 2013, in *Genger v. Genger*, 651089/2010 (Sup. Ct. N.Y. County).

7.      Attached as **Exhibit E** is a true and correct copy of the Settlement Agreement dated June 16, 2013.

8.      Attached as **Exhibit F** is a true and correct copy of the Stipulation and Proposed Order of Dismissal (the "Delaware Dismissal"), entered August 30, 2013 in *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct).

9.      Attached as **Exhibit G** is a true and correct copy of a letter, dated August 9, 2013, from Jeremy Anderson, as attorney for Dalia Genger as trustee of the Orly Genger 1993 Trust, to Chancellor Strine in *Genger v. TR Investors, LLC*, C.A. No. 6906-CS (Del. Ch. Ct).

10.     Attached as **Exhibit H** is a true and correct copy of the Order to Sever [Dkt. # 1153], entered November 25, 2014, in Genger v. Genger, Index No. 651089/2010 (Sup. Ct. N.Y. County).

2

11.     Attached as **Exhibit I** is a true and correct copy of the Orly Genger 1993 Trust Agreement.

12.     Attached as **Exhibit J** is a true and correct copy of the Memorandum of Law of Dalia Genger [Dkt. #216], filed March 6, 2012, in support of Dalia Genger's motion to dismiss the complaint in *Genger v. Genger*, Index No. 651089/2010 (Sup. Ct. N.Y. County).

13.     Attached as **Exhibit K** is a true and correct copy of the Amended Answer and Cross-Petition of Dalia Genger, filed August 22, 2017, in *In re Orly Genger*, File No. 2008-0017 (Surr. Ct. N.Y. County).

14.     Attached as **Exhibit L** is a true and correct copy of the Notice of Motion [Dkt. #1099], filed on August 11, 2014, by Dalia Genger in *Genger v. Genger*, Index No. 651089/2010 (Sup. Ct. N.Y. County).

Dated: New York, NY
      February 5, 2018

By: _____
      John Boyle

3

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X

In the Matter of

    DALIA GENGER,
    Trustee of the Orly Genger 1993 Trust,

        Petitioner,

            -against-

ORLY GENGER, ARIE GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
TRANS-RESOURCES, INC., ARNOLD BROSER,
DAVID BROSER, JOHN DOES. 1-20, and
JANE DOES 1-20,

        Respondents,

-----------------------------------------------------------------------X

New York County Surrogate's Court
MISCELLANEOUS DEPT.

**JUN 1 4 2016**

**FILED**

Clerk_____

Index No. ⅬOO8 -17

**PETITION FOR
TURNOVER OF
TRUST PROPERTY
AND OTHER RELIEF**

TO THE SURROGATE'S COURT, COUNTY OF NEW YORK:

    It is respectfully alleged:

<u>**The Parties**</u>

    1.    Petitioner, Dalia Genger, resides and is domiciled at 200 E. 65th Street, in the City of New York, County of New York and State of New York.

    2.    Petitioner is the Trustee of the Orly Genger 1993 Trust (the "Orly Trust").

    3.    Respondent Orly Genger ("Orly") is the only non-contingent beneficiary of the Orly Trust. The remaining respondents ("Respondents") are interested parties who wrongfully aided and abetted Orly in the misappropriation of Orly Trust assets.

<u>**Jurisdiction and Venue**</u>

    4.    This Court has subject matter jurisdiction pursuant to the Surrogate's Court Procedure Act, <u>inter alia</u>, SCPA 103(50), SCPA 207(1), and SCPA 209(6).

-1-

5.      Venue in this County is proper pursuant to, <u>inter alia</u>, SCPA 207(1).

**<u>The Orly Trust</u>**

6.      On or around December 13, 1993, Arie Genger ("Arie") settled the Orly Trust pursuant to a written Trust Agreement executed by Arie, as Grantor, the two prior Trustees, Lawrence M. Small and Sash A. Spencer (the "Trust Agreement").  (Ex. 1.)

7.      Pursuant to Article ELEVENTH, Section C of the Trust Agreement, all trust funds are to be held in the name of the Orly Trust, and no Orly Trust assets are to be used for the benefit of Orly's creditors (the "Trust Agreement Obligations").

8.      The Respondents were aware of the Trust Agreement Obligations.

**<u>Orly Trust Derivative Litigation</u>**

9.      In July 2010, Orly instituted a derivative action the Supreme Court, New York County entitled <u>Arie Genger, et al. v. Sagi Genger, et al.</u>, Index No. 651089/2010, by which she brought claims "on behalf of the Orly Trust as the beneficiary of the Orly Trust" (the "Orly Trust Derivative Litigation").  The Complaint sought to assert claims for the Orly Trust's ownership in shares of stock in a company called Trans-Resources, Inc. ("TRI").  Orly later amended her pleading to assert claims against, <u>inter alia</u>, the purchasers of those TRI shares, Respondents Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, and New TR Equity II, and TRI (collectively, the "Trump Group Entities").  (Ex. 2.)

10.     On January 2, 2013, in the Orly Trust Derivative Litigation, Justice Jaffe of the Supreme Court, New York County adopted Orly's position that she "has legal standing to represent the Orly Trust" and "may act on behalf of the Orly Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there." (Ex. 3.)

11.     Earlier on in the same Orly Trust Derivative Litigation, Orly moved to restrain

-2-

Petitioner from pursuing what Orly characterized as a "duplicative" action as Trustee of the Orly Trust before the Delaware Chancery Court, by which Petitioner was seeking a declaration of obtain ownership of the same TRI shares.  According to Orly: "In the instant action ..., I seek, among other things, the return of those [same] TRI Shares to the Orly Trust."  Also according to Orly,  Petitioner's "contention that the Orly Trust is not a party to this action ... is meritless. Orly is prosecuting this action on behalf of the Orly Trust."  The Supreme Court, New York County, agreed, restraining Petitioner from pursuing the action in the Delaware Chancery Court by which the Orly Trust had sought the TRI shares.  (Ex. 4.)

12.      As a derivative plaintiff for the Orly Trust, having prevented the 'duplicative litigation' brought by Petitioner herself on behalf of the Orly Trust, Orly became the de facto trustee of the Orly Trust and owed fiduciary duties to the Orly Trust.

13.      Respondents knew that Orly owed fiduciary duties to the Orly Trust.

### Discontinuance With Prejudice of
### The Orly Trust Claims

14.      In June 2013, Orly disclosed that she had "entered into a confidential settlement agreement to resolve all issues among the stipulating parties," which included the Trump Group Entities.  However, the settlement terms were left undisclosed.   Petitioner sought production of the settlement agreement, but Orly refused to produce it, claiming the document was too "confidential."  When it was proposed that the document be produced under "Attorney's Eye's Only" limitation, Orly refused that proposal as well.  Instead, Orly submitted the Settlement Agreement to Justice Jaffe, unsolicited, for in camera inspection.

15.      By letter dated June 28, 2013, counsel to the Trump Group Entities wrote to the Court on behalf of all settling parties "including ... Orly Genger" confirming that: "A material term of the agreement among the settling parties was the dismissal of *all* claims presently

pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group [Entities], contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group [Entities] bargained and paid for in the settlement . . ." (Ex. 5, emphases in original.)

16.     Neither Orly nor any of the other settling parties disagreed with counsel's statements regarding the scope of the settlement.  Accordingly, on July 1, 2013, Justice Jaffe signed the requested Stipulation and Order of Discontinuance with Prejudice. (Ex. 6.)

### The Trump Group Entities Settlement Agreement

17.     Months later, as part of a parallel proceeding, the United States District Court directed Orly to produce her settlement agreement with the Trump Group Entities (the "Trump Group Entities Settlement Agreement"). (Ex. 7.) The document revealed that Orly had settled her claims against the Trump Group Entities both "in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust" – the latter being the very capacity by which this Court permitted Orly to assert derivative claims.  According to its signatories, the purpose of the agreement was "to resolve all issues, disputes and disagreements between [Orly and the other Settling Parties], including but not limited to the issue of ownership of all [TRI] shares," most significantly those TRI shares claimed by the Orly Trust.

18.     In exchange, the Trump Group Entities agreed to pay $32.3 million to the so-called "AG Group," consisting of Orly, her father Arie, and Respondents Arnold and David Broser (collectively, "the Brosers").  Upon information and belief, the Brosers are creditors of Orly personally, to whom Orly owes many millions of dollars.  The payments were broken up into: (a) an immediate payment of $17.3 million and (b) two follow-up payments of $7.5 million.

-4-

According to the federal court, which reviewed the document, "Orly monetized her beneficial interest in the Orly Trust['s] [TRI] shares for $32.3 million ...." (Ex. 8.)

19.     The Trump Group Entities have since reaffirmed that the federal court construed the Trump Group Entities Settlement Agreement correctly:

> "[Any suggestion] that the confidential settlement agreement *might* only dis-miss Orly's individual claims against the Trump Group [Entities], but not resolve the Orly Trust's claims against the Trump Group [Entities] and the TPR Group . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. ... In settling the claims among them, the Trump Group [Entities], Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

20.     Evidencing this intent, in Section 6(a) of the Trump Group Entities Settlement Agreement, Orly settled and released all of her claims in the Trump Group Entities Settlement in both her derivative and individual capacities. (Ex. 7, p. 10: Orly releasing the Trumps "in all capacities.") In Section 8(a) thereof, Orly further agreed to "cause" the Orly Trust to do the same, which she later did, advising the Delaware Chancery Court that she favored dismissal of Petitioner's action on behalf of the Orly Trust. The case was dismissed.

### The Settlement Proceeds

21.     Under applicable law, the proceeds of a settlement obtained in a derivative lawsuit belong to the direct plaintiff (in this case, the Orly Trust), not the derivative plaintiff (in this case, Orly personally). Nonetheless, to date, none of the aforementioned $32.3 million (the "Settlement Proceeds") has been remitted to the Orly Trust, nor have any of the settling parties indicated an intention to do so in the future.

22.     At a hearing before Justice Jaffe on March 25, 2015, counsel to the Trump Group Entities confirmed that $17.3 million of the Settlement Proceeds has already been paid, but that

-5-

2015, Justice Jaffe neither granted nor denied the motion, but rather held it in abeyance pending this Court's determination of Orly's removal petition.  (Ex. 10.)

27.     At the March 25, 2015 hearing on Petitioner's  motion, Justice Jaffe suggested it might already be too late to deposit the Initial Payment into Court, as the $17.3 million apparently has already been paid out to non-parties.  (Ex. 9, p. 28: "it sounds like that ship has sailed").   Accordingly, Petitioner brings this Petition seeking, inter alia, monetary damages for misappropriation of Orly Trust assets.  To the extent such Settlement Proceeds are recoverable, Petitioner seeks turnover of those funds for the Orly Trust.

### Count I: Aiding and Abetting Breach of Fiduciary Duty
### Against All Respondents

28.     The allegations contained in paragraphs 1 through 27 hereinbefore are realleged as if fully set forth herein.

29.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

30.     Orly owed a fiduciary duty to the Orly Trust.

31.     Consistent with her fiduciary duty to the Orly Trust, Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

32.     Orly did not so do.  Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

33.     Orly's actions constitute a breach of fiduciary duty.

34.     Respondents were aware of Orly's fiduciary duty to the Orly Trust.

35.     Respondents knowingly induced and/or participated in Orly's breach of her fiduciary duty to the Orly Trust by, inter alia, taking the Settlement Proceeds which belong to the

Orly Trust, by drafting and entering into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other than the Orly Trust.

36.     In doing so, Respondents aided and abetted Orly's breach of fiduciary duty.

37.     The Orly Trust has been injured by Respondents' aiding and abetting of Orly's breach of her fiduciary duty to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count II: Tortious Interference with Contract
### Against All Respondents

38.     The allegations contained in paragraphs 1 through 37 hereinbefore are realleged as if fully set forth herein.

39.     The Trust Agreement is a valid contractual agreement by the Orly Trust.

40.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

41.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

42.     Respondents were aware of the Trust Agreement Obligations.

43.     The Orly Trust, acting through its de facto trustee Orly in the Orly Trust Derivative Litigation, breached the Trust Agreement Obligations by causing the Settlement Trustees to not be held in the name of the Orly Trust, and to instead use the Settlement Proceeds for the benefit of Orly's creditors, including the Brosers.

44.     Respondents caused the Orly Trust's breach of the Trust Agreement Obligations by, inter alia, taking the Settlement Proceeds which belong to the Orly Trust, by drafting and entering into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other than the Orly Trust.

45.     In doing so, Respondents tortiously interfered with the Trust Agreement Obligations.

46.     Respondents' interference with the Trust Agreement Obligations was both intentional and improper.

47.     The Orly Trust has been injured by Respondents' tortious interference with contract in the amount of $32.3 million, plus statutory interest.

### Count III: Money Had and Received
### Against All Respondents

48.     The allegations contained in paragraphs 1 through 47 hereinbefore are realleged as if fully set forth herein.

49.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

50.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

51.     Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

52.     Respondents knew that Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust.

53.     However, pursuant to the terms of the Trump Group Entities Settlement Agreement, the Settlement Proceeds were and are to be paid by the Trump Group Entities to parties other than the Orly Trust.

54.     None of the Settlement Proceeds have been paid to the Orly Trust.

55.     Respondents received and/or are currently holding the Settlement Proceeds instead of the Orly Trust.

56.     Respondents received a benefit from the Settlement Proceeds which belongs to the Orly Trust.

57.     Under principles of good conscience, Respondents should not be allowed to retain the Settlement Proceeds which belong to the Orly Trust, but rather should be compelled to return all $32.3 million to the Orly Trust, plus statutory interest.

**Count IV: Unjust Enrichment**
**Against All Respondents Except Trump Group Entities**

58.     The allegations contained in paragraphs 1 through 57 hereinbefore are realleged as if fully set forth herein.

59.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

60.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

61.     Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

-10-

62.     Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

63.     Respondents (except the Trump Group Entities) received the Settlement Proceeds instead of the Orly Trust.

64.     Respondents (except the Trump Group Entities) received a benefit from receiving the Settlement Proceeds which belong to the Orly Trust.

65.     The benefit Respondents (except the Trump Group Entities) received from payment of the Settlement Proceeds was at the expense of the Orly Trust.

66.     Under principles of equity and good conscience, Respondents (except the Trump Group Entities) must make restitution to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count V: Turnover
### Against All Respondents

67.     The allegations contained in paragraphs 1 through 66 hereinbefore are realleged as if fully set forth herein.

68.     Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

69.     Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

70.     Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

71.     Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

-11-

72.     Respondents (except the Trump Group Entities) received the Settlement Proceeds instead of the Orly Trust.

73.     Respondents (except the Trump Group Entities) have in their possession the Settlement Proceeds which should be delivered to the Orly Trust.

74.     Respondents have refused to turn over the Settlement Proceeds to the Orly Trust or pay it into Court.

75.     Respondents should be compelled to turn over to the Orly Trust all Settlement Proceeds in their possession, custody or control.

## Count VI: Accounting
## Against Respondent Orly

76.     The allegations contained in paragraphs 1 through 75 hereinbefore are realleged as if fully set forth herein.

77.     Orly has never provided an accounting of the Settlement Proceeds, which are an asset of the Orly Trust.

78.     As a matter of law and equity, Orly should provide an accounting of the Settlement Proceeds.

## Interested Parties

79.     The names and addresses of all persons, other than the Petitioner, interested in the obtaining a determination of the issues presented in this Petition, and all other persons interested in this proceeding who are required to be cited upon this application or concerning whom this Court is required to have information, are:

(a)     The following who are of full age and sound mind or are corporations or associations:

ORLY GENGER
780 Greenwich Street, Apt. 4P

-12-

New York, New York

Interest: Beneficiary and Respondent

ARIE GENGER
17001 Collins Avenue,
Sunny Isles Beach, Florida

Interest: Respondent

GLENCLOVA INVESTMENT COMPANY
41 Madison Ave,
New York, New York

Interest: Respondent

TR INVESTORS, LLC
41 Madison Ave,
New York, New York

Interest: Respondent

NEW TR EQUITY I, LLC
41 Madison Ave,
New York, New York

Interest: Respondent

NEW TR EQUITY II, LLC,
41 Madison Ave,
New York, New York

Interest: Respondent

TRANS-RESOURCES, INC.
41 Madison Ave,
New York, New York

Interest: Respondent

ARNOLD BROSER
5371 Fisher Island Drive,
Miami Beach, Florida

Interest: Respondent

DAVID BROSER
104 West 40th Street, 19th Floor
New York, New York

Interest: Respondent

SAGI GENGER 1993 TRUST
C/O John Dellaportas
Morgan, Lewis
101 Park Avenue,
New York, New York

Interest: Contingent Remainderman

(b)    The following who are persons under disability:
Infants: None
Others under a disability: None

(c)    The following persons who are confined in prison: None
(d)    The following persons whose names or whereabouts are unknown: None

80.    There are no persons, corporations or associations other than those mentioned who are interested in this proceeding.

81.    No previous application for this or similar relief has been made to this or any other court except Motion Seq. 42 (for payment into Court) in the Orly Trust Derivative Litigation, entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010 in New York Supreme Court, New York County. Motion Seq. 42 was held in abeyance by the Supreme Court pending a determination by this Court.

-14-

WHEREFORE, Petitioner requests the following relief against all Respondents:

a.      damages in in the amount of $32.3 million, plus statutory interest;

b.      imposition of a constructive trust on the Settlement Proceeds;

c.      an order directing the delivery of the Settlement Proceeds to her as Trustee;

d.      an accounting of the Settlement Proceeds; and

e.      such other relief as to the Court seems just and necessary.

Dated: June 13, 2016


_____

(Signature of Petitioner)



Dalia Genger

(Print Name)

STATE OF NEW YORK )                                       

                                          )   ss:

COUNTY OF NEW YORK ）

## VERIFICATION

I, the undersigned the petitioner named in the foregoing petition, being duly sworn, say:

VERIFICATION: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.

_____
(Signature of Petitioner)

Dalia Genger

(Print Name)

On the ____13th____ day of ____June____, 20_16_, before me personally came Dalia Genger to me known to be the person described in and who executed the foregoing instrument. Such person duly swore to such instrument before me and duly acknowledged that he/she executed the same.

_____
Notary Public

Judith Bachman
Notary Public, State of New York
No. 02-BA6048319
Qualified in Rockland County
Commission Expires Sept. 25, 200
2018

_____
JUDITH BACHMAN
LAW OFFICES OF JUDITH BACHMAN
254 S. Main Street, Suite 306
New City, New York 10956
(845) 639-3210
jlbesq_99@yahoo.com
*Attorneys for Petitioner Dalia Genger*

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT: _____ *COOPER* _____     PART _51_

Justice

_____

GENGER, DALIA

- v -

ARIE GENGER

_____

INDEX NO. _302436/02_

MOTION DATE _____

MOTION SEQ. NO. _21_

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion

**MOTION IS DECIDED IN ACCORDANCE WITH ATTACHED MEMORANDUM DECISION.**

Dated: __JUN 0 3 2016_____

MATTHEW F. COOPER *J.S.C.*
J.S.C.

Check one:  ☒ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST   ☐ REFERENCE

☐ SUBMIT ORDER/ JUDG.   ☐ SETTLE ORDER/ JUDG.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT: _____Cooper_____            PART _S1_

                              *Justice*

         Gowgon, D          INDEX NO. ___3 02436/02___

           - v -              MOTION DATE _____

         Gowgon, A          MOTION SEQ. NO. ___22___

                        MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that this motion

        is decided in accordance with the memorandum decision
        in connection with motion sequence 21

*(left margin, rotated):* MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

JUN 0 3 2016

Dated: _____            MATTHEW F. COOPER J.S.C.
                                  J.S.C.

**Check one:**  ☒ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

**Check if appropriate:**  ☐ DO NOT POST        ☐ REFERENCE

        ☐ SUBMIT ORDER/ JUDG.        ☐ SETTLE ORDER/ JUDG.

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT: _____*COOPER*_____     PART _*51*_
                        *Justice*

GENGER, DALIA

INDEX NO. *302436/02*

MOTION DATE _____

- v -

MOTION SEQ. NO. _*23*_

ARIE GENGER

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

Cross-Motion: ☐ Yes ☒ No

Upon the foregoing papers, it is ordered that this motion

is decided in accordance with the memorandum decision
in connection with motion sequence 21

Dated: **JUN 03 2016** _____            MATTHEW F. COOPER
                                                      J.S.C.                    J.S.C.

Check one:   ☒ FINAL DISPOSITION      ☐ NON-FINAL DISPOSITION

Check if appropriate:   ☐ DO NOT POST      ☐ REFERENCE

☐ SUBMIT ORDER/ JUDG.      ☐ SETTLE ORDER/ JUDG.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 51
-----------------------------------------------------------X
DALIA GENGER,

                Plaintiff,

                              Index No. 302436/2002
                              Motion Sequence Nos. 21, 22 and 23

          -against-
                              **DECISION AND ORDER**

ARIE GENGER,

                Defendant.

-----------------------------------------------------------X
**For the Plaintiff**             **For the Defendant**
Judith Lisa Bachman, Esq.      Robert Z. Dobrish, Esq.
100 Park Avenue, 16th Floor     Dobrish Michaels Gross LLP
New York, NY 10017          757 Third Avenue
(212) 210-9272             New York, NY 10017
                         (212) 532-4000

Papers and exhibits considered in review of defendant's Orders to Show Cause:

    Motion Sequence No. 21
        Defendant's Order to Show Cause..............................................................1
        Plaintiff's Opposition.............................................................................2
        Defendant's Reply Affirmation.................................................................3

    Motion Sequence No. 22
        Defendant's Order to Show Cause..............................................................1
        Plaintiff's Opposition.............................................................................2
        Defendant's Reply Affirmation.................................................................3

    Motion Sequence No. 23
        Defendant's Order to Show Cause..............................................................1
        Plaintiff's Opposition.............................................................................2
        Defendant's Reply Affirmation.................................................................3

**Matthew F. Cooper, J.:**

    Divorced more than a decade ago, the parties, along with their two grown children, have

been relentlessly litigating against one another ever since.  The case is now before me on a series

of post-judgment matrimonial motions brought by the ex-husband, Arie Genger ("Arie"), against

the ex-wife, Dalia Genger ("Dalia").

    The issue in all three motions is which ex-spouse owns a stock purchase agreement (the

"S.P.A.") that was used by Arie to sell shares of a company he owned to the parties' son, Sagi

Genger ("Sagi"). The S.P.A. is also the subject of a lawsuit between Arie and Sagi in which Arie seeks to collect payment from his son on the instrument.

Arie contends that the S.P.A. is his separate property. Dalia asserts that the S.P.A. is a non-liquid marital asset and, pursuant to the terms of a Stipulation of Settlement (the "Stipulation"), which was signed by the parties on October 26, 2004, and was incorporated into the judgment of divorce dated January 14, 2005, is subject to distribution by way of a coin toss. As a result of having unilaterally conducted the coin toss on January 5, 2015, Dalia further contends that the S.P.A. now belongs to her. In each of the motions, Arie seeks a finding that the coin toss was invalid and that the instrument belongs to him.

*Background*

What is notable about the motions is not so much the S.P.A., it being of little value relative to the parties' overall wealth. Rather, it is that the motions are just one more installment in what has been described as the "Genger family's litigation saga" (*Genger v Genger*, 76 F Supp 3d 488, 491 [SDNY 2015]), with the parties and their two children continually suing one another personally and through their various family-held businesses. A Westlaw search reveals that the Genger's lawsuits against each other have resulted in almost 40 reported decisions from the New York State Supreme Court and the Federal District Court for the Southern District of New York. Of the state court decisions, at least 10 have been from the Appellate Division, First Department. There has also been extensive litigation in the Delaware state courts, as well as countless unpublished decisions and orders from trial judges in the matrimonial and IAS parts of this court.

As other judges have lamented, the "bitter and seemingly endless battle" (*Glencova Investment Co. v Trans-Resources, Inc.*, 874 F Supp 2d 292, 295 [SDNY 2012]) between the family members, which pits Dalia and Sagi against Arie and the couple's daughter, Orly Genger,

2

("Orly"), results, in large part, from the divorce itself. In one of the Genger family cases that was before her, Federal Judge Katherine B. Forrest stated

> "As Tolstoy famously wrote, 'Happy families are all alike; every unhappy family is unhappy in its own way.' (Leo Tolstoy, *Anna Karenina* 1 [Constance Garnett trans., 1978]). In the case of the wealthy Genger family, that unhappiness has taken the form of a seemingly never-ending series of lawsuits stemming from the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch, respectively. Together, Arie, Dalia, their son Sagi, and their daughter Orly have employed a small army of lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as miserable as possible"

(*Genger*, 76 F Supp 3d at 491).

In a decision rendered in February of this year after a 27-day trial in one of the many lawsuits that Orly and Sagi have brought against each other in New York County Supreme Court, Justice Barbara Jaffe wrote:

> "The parties are siblings; their family has been mired in litigation in several jurisdictions for many years, all inspired by the contentious divorce of the parties' parents. This action reflects the parents' enmity which has malignantly spread to their children".

(*Orly Genger v Sagi Genger*, Sup Ct, NY County, February 10, 2016, Jaffe, J., index No. 100697/08)

Despite having more money than they could ever hope to spend, the Genger's interminable battle over who gets what has resulted in the two family camps having no relationship with the other; the only contact the siblings have with each other and each parent has with the child with whom he or she is not aligned is when they are in a courtroom litigating. Perhaps the saddest manifestation is that Arie has never seen his grandchildren. One gets the sense that this may indeed be a case where it really is not about the money: it is about a

dysfunctional family where each member is intent on inflicting as much pain as possible on his or her ex-spouse, parent, child or sibling.

The Gengers have the right, of course, to make each other as miserable as they want. The problem is that the method they have chosen adversely impacts the court system and the people it serves. Litigation like the type the Genger family members have engaged in over the last decade – litigation that knows no bounds and is brought to inflict punishment on former loved-ones as much as it is to resolve actual claims – demands a disproportionate share of already limited judicial resources. The result is that litigants who lack the resources to command a "small army of lawyers," but often have claims equally or more pressing than the Genger's, find themselves receiving less time and attention from the courts than their cases deserve.

*Statement of Facts*

According to Justice Jaffe's trial decision, quoted above, much of the blame for making the Gengers a family whose *raison d'etre* is to sue one another rests with Arie and Dalia's decision to have Sagi take an active role in arriving at the terms of the divorce Stipulation. To make matters worse, the Stipulation provided that Sagi was to be appointed attorney-in-fact so that he could allocate non-liquid marital assets to his mother and father in order to effectuate an equal distribution of those assets. Predictably, this proved highly problematic, with Arie, joined by Orly, charging that Sagi was making allocations solely to benefit Dalia, and in turn, Sagi himself.

The S.P.A. is but one tiny sliver of the family's financial pie. Dated March 8, 2004, it requires Sagi to make payments each year to Arie in exchange for Arie having transferred to him 100 shares of common stock of AG Real Estate GP, Inc., a company used by Arie in connection with the family's Canadian real estate investments.

4

Notably, the value of the S.P.A. is only worth the amount that Arie will obtain by suing his son on the instrument, there being no indication that Sagi will ever pay voluntarily. At oral argument, both sides conceded that the very most Arie could hope to realize is $300,000. Moreover, if things proceed the way they have, it will presumably be years, along with hundreds of thousands of dollars in additional legal fees, before he gets a penny. On the other hand, if Dalia was granted ownership of the S.P.A., it can safely be assumed that she would waive enforcement of the instrument against Sagi, thereby relieving the child with whom she is aligned from having to make the required payments.

The "coin toss" provision, which is found in Article II of the Stipulation ("Distribution of Assets"), states that if the parties have not sold or divided a non-liquid marital asset by the second anniversary of the Stipulation, and are then unable to reach an agreement as to its disposition within 45 days of the anniversary date, a coin toss will be held to determine the value of the asset and which party owns it. The Stipulation sets out the procedure for the coin toss with the same type of detail one would expect from the rules governing the coin toss at the National Football League's Super Bowl.

The second anniversary of the Stipulation was October 26, 2006, a date that passed without the S.P.A. being sold or divided. Similarly, no agreement was reached as to the disposition of the S.P.A. by December 10, 2006, that being the 45th day following the two-year anniversary date. Despite the absence of a sale, division, or agreement as to the disposition of the instrument by either of the trigger dates, there was no demand by either party for a coin toss. In fact, the purported coin toss did not take place until more than nine years later when, on January 5, 2015, Dalia unilaterally conducted the event without her ex-husband's participation. As a result of having done so, she now claims ownership of the asset.

5

Dalia's decision to move forward with the coin toss after so many years was not the result of whim or happenstance.  Instead, it was precipitated by the Appellate Division rendering a decision on December 4, 2014, in *Genger v Genger*, 123 AD3d 445 (1st Dept 2014), one of a multitude of Genger appeals before it.  This appeal, which pitted Arie against Sagi and Dalia, stemmed from a decision by Justice Cynthia Kern, another Supreme Court judge who has handled Genger cases.  Although she found that Arie owned the S.P.A., she denied summary judgment to him in his effort to collect against Sagi on the instrument and on three promissory notes.  The Appellate Division reversed the denial of summary judgment and remanded the matter to Justice Kern for "a calculation of the amount of damages owed to Arie under the stock purchase agreement," as well as a "calculation of the simple interest owed to him in accordance with the terms of [the] notes...and the stock purchase agreement" (*Genger* at 447-448).

While Arie construed the Appellate Division's decision as a clear acknowledgment that he owned the S.P.A., Dalia apparently viewed certain language used in the decision as reason for her to demand the coin toss.  On December 22, 2014, two weeks after the decision, one of Dalia's matrimonial attorneys, Judith Bachman, Esq., sent notice to one of Arie's attorneys, Edward Klimerman, Esq., notifying him that the long-delayed event would take place on January 5, 2015.  Despite being advised by a letter from Arie's matrimonial attorney, Robert Z. Dobrish, Esq., that Arie objected to the coin toss and would not participate, Dalia proceeded with the toss on January 5 without Arie being present.  Although the Stipulation specifies that "the coin will be tossed in the air by Orly Genger, or in her absence by a person mutually acceptable to the Husband and the Wife," neither Orly nor a "mutually acceptable" person tossed the coin on January 5, 2015.  Instead, it was done by one of Sagi's lawyers, John Dellaportas, Esq., of Morgan, Lewis & Bockius, LLP, who was presumably properly attired for the task in a head referee's striped jersey and white cap.

6

As one would imagine, these events gave rise to another round of frenzied motion practice. Arie brought the series of motions that are the subject of this decision, and he moved before Justice Kern, pursuant to the Appellate Division's decision remanding the case to her, for judgment against Sagi on the S.P.A. Dalia, in turn, cross-moved for summary judgment declaring her to be the instrument's rightful owner.

Naturally, I would have preferred if Justice Kern had decided the coin toss issue, thereby subjecting her decision, rather than mine, to the inevitable appeal. She, however, in a decision dated February 26, 2015, ruled that "the determination of whether the coin toss was valid should be made by the Honorable Matthew Cooper in the matrimonial part" (*Genger v Genger*, Sup Ct, NY County, Kern J., index No. 104249/07). In making the referral, she reasoned that this was ultimately a decision to be made within the context of the post-divorce proceeding, especially in that the ex-husband had already moved before me to set aside the coin toss as invalid. In the end, the coin toss issue, like just about everything in world of the Gengers, goes back to the divorce itself. Thus, it is appropriate for the issue to be decided in a matrimonial part.

### Legal Analysis

In support of their quest for ownership of the S.P.A., both sides look to this stand-alone, single-sentence paragraph, from the Appellate Division's December 2014 decision:

> "To the extent the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a 'coin toss' procedure set forth in the divorce settlement, Arie owns the instruments and the debts are owed to him"

(*Genger*, 123 AD3d at 446).

More precisely, each side looks to one or the other of the two clauses comprising the sentence. Dalia points to the sentence's dependent clause, consisting of these words: "To the extent the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a

7

'coin toss' procedure set forth in the divorce settlement." According to Dalia, by including this language in the sentence, the Appellate Division authorized her to proceed with the coin toss, which resulted in her obtaining ownership of the S.P.A. Arie, on the other hand, focuses on the independent clause, which consists of these words: "Arie owns the instruments and the debts are owed to him." According to Arie, this was a definitive declaration by the Appellate Division that he owns the S.P.A.

The problem with each side's textual analysis is that it disregards the need to look at the sentence as a whole rather than just the individual clauses of which it is composed. While the dependent clause refers to the coin toss procedure, it is not a statement by the Appellate Division that the S.P.A. is an asset subject to the procedure. It serves only to introduce and modify the independent clause that follows it; grammatically, it cannot stand on its own as a declaration of anything. Likewise, the statement contained in the independent clause that Arie owns the instruments is not absolute; it is subject to the provisions of the words preceding it.

Because of the wording of the dependent clause, it is impossible to reconcile the two clauses in a way that would result in the sentence as a whole making any sense, particularly when viewed in the context of what the Stipulation states. If one substitutes the common meaning for the prepositional phrase "to the extent that," the sentence would read like this: "[Inasmuch as] the notes and stock purchase agreement were considered 'non-liquid assets,' subject to a 'coin toss' procedure set forth in the divorce settlement, Arie owns the instruments and the debts are owed to him." And because it is necessary to give full force and effect as to each word in the sentence's two clauses, the conclusion to be drawn is that if the S.P.A. is subject to the coin toss procedure, it is Arie's property. This, of course, is in total conflict with the Stipulation. Under the very clear terms of the Stipulation, the complete opposite is true: If the S.P.A. is an asset that is subject to a

coin toss, then the only way Arie would be able to claim ownership of it is by winning the coin toss. Put another way, absent a coin toss, the only way the S.P.A. can be found to belong to Arie is if it is not a marital asset, and instead, as he asserts, is his separate property. In that case, the S.P.A. would not be subject to equitable distribution by way of the coin toss provision, or, for that matter, by any other method.

With a textual analysis of the crucial sentence proving to be unproductive, the alternative is to look to what the Appellate Division *did* with regard to the S.P.A., as opposed to what it *said*. What it did was remand the matter to Justice Kern for a "calculation of the amount of damages owed to Arie under the stock purchase agreement" (*Genger,* 123 AD3d at 447). Significantly, it did not remand the matter for a determination as to who owns the S.P.A. or whether it is subject to the coin toss procedure. Moreover, it did not authorize Dalia to proceed with the coin toss. It simply sent the case back for a determination as to how much Sagi owes Arie. To the extent that the Appellate Division acted as it did, it was clearly indicating, by deed if not by words, that it considered the S.P.A. to be Arie's separate property.

Additional authority supporting the finding that the S.P.A. belongs to Arie comes from a a post-judgment matrimonial arbitration decision, which the arbitrator, retired Judge E. Leo Milonas, rendered on May 6, 2008, after hearing 14 days of testimony. With regard to the family's Canadian real estate investments, he stated the following: "Dalia never had any real or equitable marital interest in the Canadian venture. The arbitrator therefore dismisses Dalia's AG Properties claim." According to the decision, what is referred to as "AG Properties" primarily includes the limited partnership that Arie established, AG Real Estate Partners, L.P., of which 90% was owned by Sagi and Orly as limited partners, with the remaining 10% owned by the

9

general partner, AG Real Estate GP, Inc., a corporation owned by Arie. It was the stock in AG Real Estate GP, Inc. that Arie then sold to Sagi through the S.P.A.

Inasmuch as the S.P.A. consists of shares of the general partner in AG Real Estate Partners, L.P., the partnership at the center of the Canadian real estate investments, it constitutes property that comes within the scope of the arbitrator's dismissal of Dalia's "AG Properties claim." The dismissal is based on the arbitrator's express finding that "Dalia never had any real or equitable marital interest in the Canadian venture." Thus, the arbitration decision must be seen as conclusively determining that the S.P.A. was not marital property to which Dalia had an equitable claim.

The fact that Dalia took no action for so many years with regard to the S.P.A. demonstrates that she too regarded the arbitrator's decision to be a binding determination that she had no claim to the instrument. It was only after Arie sued Sagi on the S.P.A. and the Appellate Division rendered its decision, with its confusing sentence referencing the coin toss, that Dalia was suddenly motivated – after close to a decade of inactivity – to demand and then proceed with the coin toss. The effort, however, was to no avail. Whatever happened when Dalia's attorney flipped a coin into the air on January 5, 2015, was of no force and effect. This is because the S.P.A. was not, and is not, properly the subject of such a procedure. Although it is a non-liquid asset, the record establishes that it is not a marital asset; instead, the S.P.A. is Arie's separate property and thus not susceptible to division between the parties by coin toss or other means.

*Conclusion*

The Genger story is compelling in its own way, as is any story of a family in turmoil. Much like watching a televison series about a rich and powerful, but ultimately tragic, family, we marvel at how people can have so much materially, and yet be so incredibly unhappy that they

10

dedicate their lives to suing their own sons, daughters, mothers, fathers, brothers and sisters. But as with most stories like this, there comes a time when it becomes simply tiresome, a time when we have seen far too much of the characters, their constant self-absorption and sense of entitlement, and their incessant troubling behavior.

The same way that a series about an unhappy family must ultimately come to an end, the time for the Gengers continuing to occupy center stage in the New York court system must   also end. Recently, our new Chief Judge, Janet DiFiore, unveiled an initiative to curb what she described as "troublesome" inefficiencies in court operations. In an address to the court system's administrative judges, she stated that she wanted to "make certain that we are putting our resources to our highest and best uses" *(New York Law Journal*, March 31, 2016 at 1, col 3). It seems obvious that continuing to give the Gengers the exorbitant amount of court time that they demand is not putting our resources to their "highest and best uses."

With the dispute over the S.P.A. having been decided, it is this judge's hope that the parties and their children might take a step back and reflect on how destructive this path of constant litigation is, not only to them, but to the courts and the other litigants who truly need our services. If they are unable to do so, it may be incumbent on judges and court administrators to devise a method to curb what is becoming perilously close to an abuse of the judicial system.

In light of the foregoing, defendant's three motions are granted to the extent they seek to have him declared the owner of the S.P.A. and the coin toss declared invalid.

This constitutes the decision and order of the court.

Dated: June 3, 2016                    Enter: _____

**MATTHEW F. COOPER**
**J.S.C.**

11

SURROGATE'S COURT : NEW YORK COUNTY

-----------------------------------------X

In the Matter of the Application of
Orly Genger to Remove Dalia Genger
as Trustee of the The Orly
Genger 1993 Trust Established on
December 13, 1993, by



New York County Surrogate's Court

Date: __June 21,2017__

File No. 2008-0017

             ARIE GENGER,

                  Grantor.

-----------------------------------------X

A N D E R S O N, S .

     This is a proceeding by Orly Genger, the primary
beneficiary of an irrevocable inter vivos trust established in
1993 by her father, Arie Genger, seeking removal of her mother,
Dalia Genger, as trustee and the appointment of a successor
trustee.  Pending are two motions to dismiss Orly's third
amended petition, one by Dalia and the other by the trustee of
the contingent remainder beneficiary, a trust Arie Genger
established for the benefit of Orly's brother Sagi (the "Sagi
Trust").  For the reasons stated below, the motions are denied.

     The trust at issue (the "Orly Trust") provides for
discretionary income and principal distributions to Orly for
life, with remainder to her descendants, or, if none, to the
Sagi Trust.  The original trustees and a series of successors
served until January 2008, at which time Dalia was designated
trustee. By this time, Dalia and Arie had concluded a bitter
divorce. Orly, who believed her mother "would not protect her
interests ... because of [her] animosity towards Arie, and her
collusion with Sagi" immediately commenced a proceeding in this

court, challenging the validity of her mother's appointment. In the alternative, she sought the appointment of a "special trustee" to investigate alleged "wrongful dealings concerning the assets and income of the trust."  In deference to Orly's position, Dalia refrained from acting as trustee during the pendency of the application. However, on December 31, 2008, the court held that Dalia's appointment was valid under the terms of the trust and that Orly had set forth no grounds that would warrant the appointment of a "special trustee." The application was thus denied "without prejudice to renewal if future circumstances warrant[ed] such relief" (*Matter of Genger*, NYLJ, Jan. 9, 2009, at 34, col 2 [Sur Ct, NY County 2009]). Thereafter, Dalia began acting as trustee.

Seven months later, Orly commenced the instant proceeding to remove her mother as trustee and to appoint a successor trustee. Orly also sought to restrain Dalia, during the pendency of the proceeding, from selling or otherwise encumbering the Orly Trust's 19.43% interest in Trans-Resources, Inc. ("TRI"), an allegedly valuable agricultural and industrial chemical manufacturing company founded by Arie. After a hearing, the court memorialized an agreement between the parties in an order dated July 1, 2009, which directed that Dalia give 10-days' notice of any offer to purchase the shares and of any attempt by Dalia or anyone acting on her behalf to sell or otherwise encumber those shares (the "July 1 2009

2

Order").[1]

After Orly amended the petition for a third time to allege additional conduct as a basis for removal, Dalia moved to dismiss for failure to state a claim and for failure to join a necessary party, the Sagi Trust (CPLR 3211[a][7],[10]). The court directed joinder of the Sagi Trust and held the balance of Dalia's motion in abeyance pending the completion of jurisdiction (see Matter of Genger, NYLJ 1202666658274 [Sur Ct, NY County 2014]). After Orly served the trustee of the Sagi Trust (the "Sagi Trustee"), he moved to dismiss for lack of personal jurisdiction (CPLR 3211[a][8]), claiming that service of process upon him by registered mail in Israel where he resides was insufficient under the Hague Convention. The court granted the motion (see Matter of Genger, NYLJ 1202723666996 [Sur Ct, NY County 2015).

After the trustee was served process in accordance with the Hague Convention, Dalia renewed her motion to dismiss the removal petition and the Sagi Trustee moved to dismiss as well. Both movants seek dismissal on the ground that the petition fails to state a claim (CPLR 3211[a][7]). In addition, the Sagi Trustee argues that the petition should be dismissed because

---

[1]     The July 1, 2009 Order was subsequently reaffirmed by the court on August 18, 2009 and then supplemented by a stipulation dated September 8, 2010, which provided that, in addition, Dalia would give notice of any intention to vote the Orly Trust's TRI shares for any purpose.

3

Orly purportedly 1) attempted to commit a fraud against the court by making a false statement in her petition concerning her proposed successor trustee and 2) is "exploiting" this proceeding to delay Dalia's efforts to recover on behalf of the Orly Trust funds that Orly allegedly has received on the trust's behalf in settlement of various litigations in other courts, but has kept for her personal use. Orly and the guardian ad litem for Orly's unborn issue oppose the motions.

Before turning to the merits of these motions, the court notes that Dalia did not attach to her motion papers a copy of the third amended petition. This is a technical defect which could be viewed as a basis to deny Dalia's motion (*see e.g. Alizio v Perpignano*, 225 AD2d 723 [2d Dept 1996]). This court has noted previously that "filing a motion which requires the court to search its records to obtain a pleading upon which the motion is based is not an advisable litigation practice" (*Matter of Terian*, NYLJ 1202646597731, at *3 [Sur Ct, NY County 2014], *citing Sheedy* v Pataki, 236 AD2d 92 [2d Dept 1997]; Loeb v *Tanenbaum*, 124 AD2d 941 [3d Dept 1986]). However, in this instance, the court will consider the motion, since the pleading was annexed properly to the Sagi Trustee's related motion to dismiss and is therefore easily accessible for review.

Since both movants seek dismissal pursuant to CPLR 3211(a)(7), we address first whether the allegations in the

4

amended petition state sufficient grounds for removal under SCPA § 711.  On a motion to dismiss for failure to state a claim, the court must "'accept the facts as alleged in the [pleading] as true, accord [petitioner] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory'" (*Braddock v Braddock*, 60 AD3d 84, 86 [1st Dept 2009], *quoting Leon v Martinez*, 84 NY2d 83, 87-88 [1994]).  Respondent on the motion may submit affidavits, but they "will almost never warrant dismissal under CPLR 3211 unless they 'establish conclusively that [petitioner] has no [claim or] cause of action'" (*Matter of Lawrence*, 11 NY3d 588, 595 [2008], *quoting Rovello v Orofino Realty Co.*, 40 NY2d 633, 635-636 [1976]; *see also Basis Yield Alpha Fund v Goldman Sachs Group, Inc.,* 115 AD3d 128 [1st Dept 2014]).  The issue of "[w]hether a [petitioner] can ultimately establish [his or her] allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]).

Petitioner seeks removal under subsections 2, 3, 7, 8 of SCPA § 711. SCPA § 711(2) provides that a fiduciary's letters may be revoked,

> "[w]here by reason of his having wasted or improperly applied the assets of the estate, ... or otherwise improvidently managed or injured the property committed to his charge, ... or by reason of other misconduct in the execution of his office or dishonesty, drunkenness, improvidence or want of understanding, he is unfit for the execution of his office."

5

Subsections 711(3) and (7) provide a further ground for removal where a fiduciary has "wilfully refused or without good cause neglected to obey any lawful direction of the court contained in any decree or order or any provision of law relating to discharge of his duty" or "has removed property of the estate without the state without prior approval of the court." Finally, 711(8) provides for removal where a fiduciary "does not possess the qualifications required of a fiduciary by reason of substance abuse, dishonesty, improvidence, want of understanding, or ... is otherwise unfit for the execution of the office."

Here, the conduct alleged (and assumed to be true) in Orly's 31-page pleading details a course of conduct by Dalia after December 31, 2008 (the date the court determined her appointment was proper) that, if true, could be a basis for removal under the above subdivisions of SCPA § 711. Orly alleges in great detail numerous actions by Dalia that have contributed to and/or resulted in the depletion of assets of the Orly Trust or otherwise disadvantaged the Orly Trust in violation of her fiduciary duty. She offers a substantial motive for such conduct as well: a desire to punish Orly, who has maintained a relationship with her father following the divorce, and to benefit Sagi with whom Dalia maintains a close relationship.

Orly alleges that the Orly Trust and the Sagi Trust were

6

established by Arie in 1993 as an estate planning vehicle for Arie and Dalia to pass some of their substantial wealth to their children. Initially, each trust was funded with a $600,000 gift from Arie and each child's 48% interest in D & K LP ("D & K"), a family owned limited partnership which was named for "Dalia and the Kids." Dalia was general partner and owned the remaining 4% of D & K.

At about the same time that the trusts were funded, D & K purchased 240 shares (a 49% interest) in TPR Investment Associates, Inc. ("TPR"), a closely held family corporation, for $10,200,000. The shares were purchased in part with $600,000 from each trust and $50,000 from Dalia. The balance ($8,950,000) was satisfied with a recourse promissory note (the D & K Note") payable over ten years. The D & K Note was secured by a pledge of the 240 TPR shares owned by D & K. Each trust and Dalia assumed liability on the note in proportion to its/her interest in D & K. Thus, at the conclusion of the transaction, each trust had assumed liability for 48% of the D & K Note, but also through D & K obtained an indirect interest in 23.52% of TPR.  Dalia, for her part, had assumed liability for 4% of the D & K Note and obtained an indirect interest in 1.96% of TPR.

At this time, Arie owned the remaining 51% of TPR. TPR also had a majority interest in TRI. D & K initially used dividends from TRI (distributed by TPR) to pay the D & K Note.

7

However, in 1999, TRI stopped paying dividends and so D & K stopped making payments on the note. No effort was made to enforce the D & K Note, however.  According to Orly, everyone involved understood that the D & K Note and the pledge of TPR shares as security were part of an estate plan that would be defeated if the note were enforced by TPR.

In October 2004, when Arie and Dalia divorced, Dalia received as part of the divorce settlement Arie's 51% interest in TPR. In addition, the parties caused TPR's 52.85% interest in TRI to be divided among Arie (13.99%), the Orly Trust (19.43%) and the Sagi Trust (19.43%). The Orly Trust and the Sagi Trust also granted Arie an irrevocable lifetime voting proxy over their TRI shares. As a result, Arie and the trusts in combination had a controlling interest in TRI and TPR no longer had an interest in TRI.

According to Orly, as divorce loomed, Dalia as the general partner of D & K took steps to give Sagi control over the management of D & K. To that end, she and Sagi formed D & K GP LLC ("D & K GP). Dalia then exchanged her general partnership interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% interest in D & K GP for $1.00 and, pursuant to D & K's Limited Liability Agreement, Sagi obtained the power to select a manager of D & K GP, who would be responsible for managing D & K's assets.  Sagi then selected himself to manage D & K GP. Orly claims that the creation of D

8

& K GP shielded Dalia and Sagi from any personal liability stemming from their interests in D & K, including personal liability relating to the D & K Note. In addition, Dalia, as the majority shareholder of TPR, facilitated Sagi's becoming a board member of TPR (along with Dalia) and its Chief Executive Officer. Later (but prior to her becoming trustee) Dalia, in exchange for $5 million, divested herself of her interest in TPR, leaving Sagi squarely in control of TPR and its interest in the D & K Note, while at the same time controlling D & K through D & K GP.

Orly further alleges that, once in control of TPR and D & K, Sagi (with the assistance of Dalia) embarked on a scheme to benefit himself and Dalia at the expense of Arie and Orly, which involved trying to strip the Orly Trust of its indirect interest in TPR and direct interest in TRI. The scheme was first aided by Dalia's insistence as part of the divorce settlement that the original trustees of the Orly Trust and the Sagi Trust be replaced by friends or relatives of Sagi, who would act at her and Sagi's behest. Then, in 2008, one such trustee of the Orly Trust, Sagi's sister-in-law Lea Fang, resigned and appointed Dalia against the wishes of Orly. According to Orly, Dalia in her role as trustee then became an "active and willing participant in Sagi's scheme."

Among the many specific acts as trustee that Orly asserts were part of the scheme and are grounds for removal is Dalia's

9

execution of an agreement as trustee with D & K GP (by Sagi) and TPR (by Sagi) on February 9, 2009, entitled, "Meeting of Partners of D & K LP" (the "Agreement"). The Agreement, alleged to have been signed by Dalia for no consideration, explicitly "clarified" the authority of D & K GP (as per an earlier agreement executed by Lea Fang, the prior trustee of the Orly Trust) to encumber the Orly Trust's TRI shares for the benefit of D & K in connection with the D & K Note. The Agreement also provided that Sagi and Dalia would be indemnified for any claim in connection with the Agreement. According to Orly, the purpose of the Agreement was to give TPR, which was controlled by Sagi, the ability to deplete the Orly Trust of its assets.

Orly also alleges that Dalia failed to stop TPR from foreclosing on the D & K Note (which she asserts was never intended to be enforced) and from selling at auction on February 27, 2009, D & K's 240 shares of TPR which secured the D & K Note. TPR then purchased the shares for $2.2 million in what Orly alleges was a "bogus sale" because the value of TPR shares was significantly higher. The result was that D & K's obligation on the note was reduced far less than it should have been while D & K's interest in TPR was in effect forfeited to TPR. This, in turn, not only rendered the Orly Trust's interest in D & K worthless, since D &K no longer owned TPR shares, but also left the Orly Trust liable for its proportionate share of the deficiency (about $4.5 million) and exposed it to the

10

possibility that TPR would seek to foreclose on the Orly Trust's TRI shares to satisfy the D & K Note as the Agreement would allow.

Orly alleges that, despite numerous requests for information about Dalia's administration of the Orly Trust, she was not informed by Dalia of the foreclosure and the sale of D & K's TPR shares even though, by this time, there was no issue that Dalia was acting as trustee and was aware that TPR was enforcing the D & K Note. According to Orly, when she finally learned of the foreclosure - after it had been concluded - she commenced the instant proceeding to remove Dalia and obtained the July 1 2009 Order. However, Dalia repeatedly violated the July 1 2009 Order by executing on behalf of the Orly Trust a series of agreements in 2011 and 2012 that negatively impacted the trust and its interest in TRI.[2]

One such agreement was a settlement with TPR that Dalia executed as trustee in October 2011. Pursuant to such agreement, the Orly Trust transferred its interest in D & K to TPR and disclaimed any interest it might have in TPR directly or indirectly (through D & K). TPR, for its part, cancelled the Orly Trust's share of the deficiency as guarantor of the D & K Note (about $4.5 million) and the Orly Trust executed a

---

[2]    During the course of this proceeding, Orly, on behalf of the Orly Trust, commenced lawsuits in New York County Supreme Court relating to the Orly Trust's TRI shares and D & K's interest in TPR. Orly alleges that by executing these agreements in 2011 and 2012 Dalia also violated restraints issued in those actions as well.

11

$4,000,000 promissory note in favor of TPR. In addition, TPR relinquished any claim it might have to the Orly Trust's TRI shares. Orly alleges that the settlement agreement was unfavorable for a variety of reasons, including that it unnecessarily saddled the Orly Trust with debt "that it has no hope of paying off" and improperly sought to entrench Dalia as trustee, since her removal as trustee was made an "event of default" under the note.

These allegations and others raise significant issues about whether Dalia's efforts as trustee have been calculated to benefit herself and others at the expense of the Orly Trust in violation of her fiduciary duty and whether she poses an ongoing threat to the assets of the Orly Trust. In other words, Dalia's fitness to serve within the meaning of SCPA § 711 has been squarely placed in issue in the petition. In view of the above, movants' arguments are insufficient to support dismissal for failure to state a claim.

For example, movants rely upon self-serving justifications for Dalia's conduct, when any purported explanation is irrelevant under circumstances where the allegations in the petition are assumed to be true (*see Braddock v Braddock*, 60 AD3d 84, *supra*). Movants also challenge Orly's allegations with matters outside the pleading. However, movants' submissions and arguments in this regard do not conclusively establish that Orly has no claim for removal (*see Basis Yield Alpha Fund*

12

*v Goldman Sachs Group, Inc.*, 115 AD3d 128, *supra*). Moreover, such submissions are more appropriate on a motion for summary judgment rather than on the present motions. Movants do not request that the court convert the motions into ones for summary judgment (CPLR 3211[c] and the court, on its own, declines to do so (*id.*). This proceeding, despite the time that has elapsed since its commencement, is still in its pre-discovery stage and should continue in due course as contemplated under the SCPA and CPLR.

As for the other arguments raised by the Sagi Trustee, none provides a basis for dismissal under CPLR 3211. His argument that Orly committed a "fraud on the court" for which dismissal is warranted is without merit.  There is a sharp factual dispute as to the truth or falsity of Orly's statement that the successor trustee she nominated, Joel Isaacson, "is not acquainted with any members of the Genger family." In any event, the alleged fraud on the court is not, as the trustee argues, a "central aspect of this case." Rather, it is tangential to the main issue before the court, namely Dalia's fitness to serve, and involves one statement in the petition. Under these circumstances, the case relied upon by the Sagi Trustee, *CDR Creances S.A.S. v Cohen* (23 NY3d 307, 323 [2014]), is plainly inapposite. In that case, unlike here, the court found clear and convincing evidence of "numerous instances of perjury, subornation of perjury, witness tampering and

13

falsification of documents by defendants."

Equally unavailing is the Sagi Trustee's argument that dismissal is warranted because "Orly is exploiting this proceeding to delay a determination on [Dalia's] application for the return of $32.3 million that Orly monetized and retained from claims she brought on behalf of the Orly Trust [in Supreme Court, New York County]." Again, there is a sharp factual dispute concerning the accuracy of the Sagi Trustee's allegation. Moreover, this issue bears no relationship to the issue before the court on this motion, namely whether Orly's third amended petition states a claim for Dalia's removal. Significantly, the Sagi Trustee cites no authority to support dismissal under these circumstances (even assuming arguendo they are true), and the court is aware of none.

Moreover, the Sagi Trustee's expressed concern as to delays in this proceeding is difficult to reconcile with his decision to defer a determination of the merits of this proceeding by moving to dismiss the petition based upon the waivable and ultimately curable defense of personal jurisdiction. As noted above, this tactical maneuver not only required a decision from the court, but then Orly's service of process upon the Sagi Trustee under the Hague Convention. The Sagi Trustee then appeared (as he could have done at the

14

outset) and the instant motions were filed.

Based upon the foregoing analysis, the motions to dismiss are denied. This decision constitutes the order of the court.

Dated: June $\lambda$[ , 2017

_____

S U R R O G A T E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of the ORLY GENGER 1993
TRUST,

       Plaintiffs,

         - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as Trustee
of the SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT CO., TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

       Defendants.

SAGI GENGER, individually and as assignee of THE
SAGI GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

         Cross-Claimants, Counterclaimants, and Third-
         Party Claimants,

         - against -

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., and WILLIAM DOWD,

         Cross-Claim, Counterclaim and/or Third-Party
         Defendants.

INDEX NO. 651089/2010

_(SECOND)_
AMENDED STIPULATION OF
DISCONTINUANCE WITH
PREJUDICE

Hon. Barbara Jaffe

Part 12

5385242.1/43419-00001

GLENCLOVA INVESTMENT CO., TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II,
LLC, JULES TRUMP, EDDIE TRUMP, MARK
HIRSCH, and TRANS-RESOURCES, INC.,

     Counterclaimants, Cross-Claimants, and Third-
     Party Plaintiffs,

     - against –

ARIE GENGER, ORLY GENGER, SAGI GENGER,
TPR INVESTMENT ASSOCIATES, INC., THE SAGI
GENGER 1993 TRUST, WILLIAM DOWD, ARNOLD
BROSER, DAVID BROSER, and ONE OR MORE
ENTITIES DIRECTED, OWNED OR CONTROLLED
BY ARNOLD BROSER AND/OR DAVID BROSER,

     Counterclaim, Cross-Claim, and/or Third-Party
     Defendants.

WHEREAS no party hereto is an infant or an incompetent as to whom a committee has been

appointed;

WHEREAS the parties hereto have entered into a confidential agreement finally resolving the

disputes between them as it relates to the subject matter of this action;

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for



Plaintiffs/Counterclaim Defendants Arie Genger and Orly Genger ("Orly"), in her individual capacity

and ~~on behalf of~~ (as beneficiary of) the Orly Genger 1993 Trust, and Third-Party Defendants Arnold Broser, David Broser

and One or More Entities Directed, Owned or Controlled by Arnold Broser and/or David Broser

(collectively, the "AG Group"), and Defendants/Counterclaimants/Third-Party Plaintiffs Glenclova

Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump,

Eddie Trump, Mark Hirsch, and Trans-Resources, Inc. (collectively, the "Trump Group"), that:

1

5389781.1/43419-00001

1.      All claims, counterclaims and third-party claims of the AG Group in this action against the Trump Group are discontinued with prejudice and without costs;

2.      All claims, counterclaims and third-party claims of the Trump Group in this action against the AG Group are discontinued with prejudice and without costs;

3.      Any and all orders, including, without limitation, the Order to Show Cause dated August 8, 2011 (Mot. Seq. 5), the Order to Show Cause for Temporary Restraining Order and Preliminary Injunction dated August 11, 2011 (Mot. Seq. 4), the Order to Show Cause and Temporary Restraining Order dated November 9, 2011 (Mot. Seq. 13) (the "November 9, 2011 OSC") and the Decision and Order dated December 28, 2011 entered in this action which restrain, enjoin or in any way limit actions by any members of the Trump Group shall be, and are hereby, vacated and dissolved. Except as specifically provided in paragraph 4 of this Stipulation, nothing in this Stipulation is intended to vacate or dissolve any order entered in this action restraining, enjoining or in any way limiting acts by Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993 Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

4.      Orly's applications that resulted in the Order to Show Cause and Temporary Restraining Order entered October 26, 2011 (the "October 26, 2011 OSC") (Mot. Seq. 012) and the November 9, 2011 OSC are hereby withdrawn. The parties hereto stipulate and agree that any and all orders, restraints, injunctions or other limiting actions in the October 26, 2011 OSC and the November 9, 2011, which restrain, enjoin or in any way limit actions by any party, individual or entity from proceeding in the matter entitled *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC et al.*, C.A. No. 6906-CS ( Del. Ch) shall be, and are hereby, vacated and dissolved.

2

5389781.1/43419-00001

5.      Nothing in this Stipulation is intended to dismiss, discontinue or release any claim asserted in this action as against Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993 Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

[INTENTIONALLY BLANK]

5389781.1/43419-00001

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED: New York, New York
June 21, 2013

MITCHELL SILBERBERG & KNUPP LLP

By: _____
Paul D. Montclare
pdm@msk.com
12 East 49th Street, 30th Floor
New York, New York 10017-1028
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

*Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD
P.C.

By: _____
Michael P. Hogan
Jeffrey D. Feldman
Ashley G. Kessler
mhogan@feldmangale.com
1700 Market Street, Suite 3010
Philadelphia, Pennsylvania 19103
(305) 358-5001
&
Russell T. McHugh
rmchugh@lwrlawyer.com
225 Broad Hollow Road, Suite 105E
Melville, New York 11747
(631) 694-0033

*Attorneys for Third-Party Defendant Arnold Broser*

SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP

By: _____
William P. Frank
Thomas J. Allingham II
John Boyle
William.Frank@skadden.com
Thomas.Allingham@skadden.com
John.Boyle@skadden.com
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Third Party Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch And Trans-Resources, Inc. (Collectively, The "Trump Group")*

4

5389781.1/43419-00001

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED:  New York, New York
          June 20, 2013

MITCHELL SILBERBERG & KNUPP LLP


By: _____
    Paul D. Montclare
    pdm@msk.com
    12 East 49th Street, 30th Floor
    New York, New York 10017-1028
    Telephone: (212) 509-3900
    Facsimile: (212) 509-7239

    *Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD
P.C.


By: _____
    Michael P. Hogan
    Jeffrey D. Feldman
    Ashley G. Kessler
    mhogan@feldmangale.com
    1700 Market Street, Suite 3010
    Philadelphia, Pennsylvania 19103
    (305) 358-5001
    &
    Russell T. McHugh
    rmchugh@lwrlawyer.com
    225 Broad Hollow Road, Suite 105E
    Melville, New York 11747
    (631) 694-0033

    *Attorneys for Third-Party Defendant*
    *Arnold Broser*

SKADDEN, ARPS, SLATE MEAGHER &
FLOM LLP


By: _____
    William P. Frank
    Thomas J. Allingham II
    John Boyle
    William.Frank@skadden.com
    Thomas.Allingham@skadden.com
    John.Boyle@skadden.com
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    *Attorneys for Third Party Glenclova*
    *Investment Company, TR Investors, LLC,*
    *New TR Equity I, LLC, New TR Equity II,*
    *LLC, Jules Trump, Eddie Trump, Mark*
    *Hirsch And Trans-Resources, Inc.*
    *(Collectively, The "Trump Group")*

3

ZEICHNER, ELLMAN & KRAUSE LLP                    THE FREYBERG LAW GROUP

By: _____                     By: _____
Yoav M. Griver                                        Mark L. Freyberg
Brian D. Leinbach                                     Mitchell Goldberg
YGriver@zeklaw.com                                    mfreyberg@freyberglaw.com
BLeinbach@zeklaw.com                                  mitchell@oglaw.net
575 Lexington Avenue                                  950 Third Avenue, 32nd Floor
New York, New York 10022                              New York, New York 10022
(212) 223-0400                                        (212) 754-9200

*Attorneys for Plaintiff Orly Genger, in her*          *Attorneys for Third Party Defendant*
*individual capacity and on behalf of the Orly*        *David Broser*
*Genger 1993 Trust*   as benefciary of

So-Ordered: _____

            Hon. Barbara Jaffe

5

5389781.1/43419-00001

ZEICHNER, ELLMAN & KRAUSE LLP

THE FREYBERG LAW GROUP

By: _____
    Yoav M. Griver
    Brian D. Leinbach
    YGriver@zeklaw.com
    BLeinbach@zeklaw.com
    575 Lexington Avenue
    New York, New York 10022
    (212) 223-0400

By: _____
    Mark L. Freyberg
    Mitchell Goldberg
    mfreyberg@freyberglaw.com
    mitchell@oglaw.net
    950 Third Avenue, 32nd Floor
    New York, New York 10022
    (212) 754-9200

*Attorneys for Plaintiff Orly Genger, in her
individual capacity and on behalf of the Orly
Genger 1993 Trust*

*Attorneys for Third Party Defendant
David Broser*

So-Ordered: _____
    Hon. Barbara Jaffe

BARBARA JAFFE
J.S.C.

5389781.1/43419-00001

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      **Recitals.**       The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.      **Initial Consideration from the Trump Group.**       Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)     release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)     pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

3.    **Further Consideration from the Trump Group.**   Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of  (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on the Notes shall be placed in escrow for the duration of their original term or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between Trans-Resources, the payee and an escrow agent selected by their mutual consent, which shall provide for their release to the Trump Group in payment of Indemnification Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below), if any, and payment to the payee of such amounts after reduction for Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and when they mature, the Trump Group will be obligated to make payment thereon in an amount equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any amount by which cash payments received by members of the Trump Group (other than Trans-Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation for services rendered plus payments for goods, services and assets provided by such persons in amounts that would have been paid for such goods, services and assets in arms' length transactions with unaffiliated third parties; provided, however, that in neither case shall the Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release Amounts or Discovery Costs).

4

4.  **Dismissal of Claims with Prejudice.**  Within two (2) business days of the Effective Date (defined below), the AG Group and the Trump Group shall take all actions necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims, cross-claims, third-party claims, issues and matters between them, and to vacate all court orders which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each pending action in which members of the AG Group and the Trump Group are parties (whether or not service of process with respect thereto has been effected), including, without limitation, each of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC,* No. 168, 2013 (Del.); *TR Investors, LLC v. Genger,* C.A. No. 6697-CS (Del. Ch.); *Trans-Resources, Inc. v. Genger,* C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR Investors, LLC, et al. v. Genger,* C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v. Trans-Resources, Inc., at al.,* No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger v. Sagi Genger, et al.,* Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State Supreme Court enter a definitive non-appealable order declaring that members of the Trump Group own all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"), with the understanding and agreement that should the request for the entry of such an order with respect to the "Orly Trust Shares" be denied or not entered in a reasonably timely fashion, then the AG Group and the Trump Group shall take all action necessary or desirable to have the New York State Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute, defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-party claims, issues and matters asserted therein; provided, however, that nothing in this Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger,* C.A. No. 4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the members of the Trump Group and William Dowd as contemplated below) and (b) against TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP LLC, Sagi Genger or Dalia Genger.  Any member of the AG Group  including, without limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger 1993 Trust seeking any remedy of any kind against any member of the Trump Group. Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as between the Trump Group and him.

      5.    **Indemnification.**

      (a)    Upon closing of this Agreement, each of the members of the AG Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii) each of the past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, predecessors, successors, heirs, executors, administrators and assigns of each person and entity referenced in clause (i), from all reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements and/or judgments (whether direct or related to joint and several liability) (the "Indemnification Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims, counterclaims, cross-claims or third-party claims raised or that could have been raised in the Litigation, and (y) claims that are pending, have been brought, or that may in the future be brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

7

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or developments relating to or conducted by Trans-Resources or any of its direct or indirect subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the aforementioned shares, (F) records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26, 2008 by any officer or director of Trans-Resources, (H) this Agreement,  (I) the business or operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to September 26, 2008 arising from or in any way related to the conduct of any member of the AG Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the indemnity provided for above shall not apply to any claims which may be brought subsequent to the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions taken or not taken by members of the Trump Group which actions or inactions no member of the AG Group was aware of or should have been aware of; provided, however, that such claim was

8

<u>not</u> encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)   The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made.  The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect.  The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or discussions with respect thereto, without the express written consent of the AG Group.

(c)     With respect to each Indemnification Amount, until such time as it has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Indemnification Amount and, the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed Indemnification Amount from any payments by Trans-Resources to be made pursuant to the Notes.

6.     **Releases.**

(a)     **The AG Group Release.** Effective on the Effective Date, each of the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them including, without limitation, any member of the Sagi Group which he, she or it shall at any time directly or indirectly control or be deemed authorized to act on behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the Trump Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any dividends or distributions from Trans-Resources), representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity, including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"), which such AG Group Releasing Party now has, has ever had or may hereafter claim to have against any Trump Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually, an "AG Group Released Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting, instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares (including any dividends or distributions relating thereto or any escrow in which such dividends or distributions may currently be or in the past have been held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and execution of this Agreement or the AG Group Releases provided hereunder; provided, however, that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of the Notes or any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to indemnify the Trump Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on, preparing for or defending such claim ("AG Group Release Amounts"). With respect to each AG Group Release Amount, until such time as such AG Group Release Amount has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such AG Group Release Amount, and the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed AG Group Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or pursued by any member of the AG Group against any member of the Trump Group for any

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

(b)      **The Trump Group Release.** Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii)

agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other

person or entity in asserting, instituting or prosecuting, any proceeding against any member of

the AG Group Released Parties with respect to any Trump Group Released Claim or any other

Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or

indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-

Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-

Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this

Agreement or the Trump Group Releases provided hereunder; provided, however, that this

Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the

terms of this Agreement or claims seeking payment of any indemnification payments required to

be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the

Effective Date and that could not, under any circumstances, have possibly been pursued prior to

the Effective Date whether or not then known, and (z) between any of the Trump Group

Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual

general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim

in violation of the immediately preceding paragraph, the Trump Group, jointly and severally,

agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees,

including legal fees and disbursements of counsel chosen by the AG Group, incurred in working

on, preparing for or defending such claim ("Trump Group Release Amounts"). With respect to

each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and severally liable for such Trump Group Release Amount, and the AG Group may at its option pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties intention that no claims shall be brought or pursued by any member of the Trump Group against any member of the AG Group for any reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

    7.    **Discovery Obligations**.    Effective on the Effective Date (defined below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks discovery or testimony from any member of the Trump Group, or if any member of the Trump Group is subpoenaed by any party to an action in which any member of the AG Group or the Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally, agrees that to the extent indemnities of the Trump Group provided for elsewhere in this Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees, including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group (it being understood that for the purposes of this Discovery Obligation indemnity only, the indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in working on, preparing for or defending such claim, it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs and fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

15

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

8. **Cooperation.**

(a)     Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

(b)     As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such settlement, cause it to agree in writing to become an AG Group member for purposes of providing the indemnity contained in Paragraph 5. Likewise, as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5.

(c)     Each member of the AG Group covenants that for so long as the indemnity contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any other trust or entity that any of them directly or indirectly controls or is or was established at their direction, or that is or was established or exists for any of their direct or indirect benefit, unless such trust or entity has agreed in writing to being a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5. The foregoing shall not restrict members of the AG Group from investing in or with such entities provided that that such investment may be liquidated, without restriction, by such member of the AG Group from time to time as may be necessary to comply with the terms of the indemnity contained in Paragraph 5.

(d)     The AG Group covenants that, subject to any confidentiality orders of any court or other restrictions imposed by law (i) with respect to any court filing made or received by it concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.**  The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process.  Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10.    **Third Party Beneficiaries.**  This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11.    **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.     **Representations and Warranties.**

(a)     Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)     Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)     Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)     Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly set forth in this Agreement, and no member of the AG Group shall make any Claim with respect thereto. Each member of the AG Group acknowledges that he, she or it is taking full responsibility for making his, her or its own evaluation of the adequacy and accuracy of all documents or information that may have been furnished to him, her or it, and that no member of the AG Group shall have any Claim against any of the Trump Group Released Parties with respect thereto, including for Claims relating to the accuracy or completeness of the information that may have been furnished to him her or it. Each member of the AG Group acknowledges and understands that each member of the Trump Group Released Parties expressly disclaims any and all liability that may be based on any of the documents and information that may have been furnished to any member of the AG Group and all liability based on such documents or information or errors therein or omissions therefrom. Accordingly, each member of the AG Group acknowledges that none of the Trump Group Released Parties has made any representation or warranty with respect to (i) any historical information, financial or otherwise, including without limitation results of operations (or any component thereof), cash flows, or financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or projections or estimates of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or documents that may have been made available to any member of the AG Group or their respective counsel, accountants or advisors with respect to any of the Trump Group Released Parties any of their respective businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the AG Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the Trump Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the AG Group acknowledges that the consideration to be received by the AG Group pursuant to this Agreement constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)      Each member of the Trump Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the Trump Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the Trump Group is consummating the transactions contemplated hereby without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the Trump Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the AG Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the Trump Group acknowledges that the consideration to be received by the Trump Group pursuant to this Agreement constitutes full and fair consideration for the release of all claims contemplated hereunder.

13.     **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and costs incurred in connection with this Agreement and negotiations related to and preparation of this Agreement and not to seek from each other reimbursement of any such costs, expenses or attorneys' fees.

14.     **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be governed by, construed and interpreted in accordance with the laws of the State of Delaware, applicable to instruments made, delivered and performed entirely in such state, without regard to the choice of law provisions thereof.

15.     **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

23

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS SECTION.

(a)     The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"), except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand, may demand arbitration by giving the other written notice to such effect in accordance with the Rules.

(b)     The arbitration will be held before one neutral arbitrator.  Within thirty (30) days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration will invite the other Party to join it in approaching the following list of individuals about serving as arbitrator and will approach such individuals with such other Party (if its invitation is accepted) or without such other Party (if its invitation is rejected or not responded to within five (5) business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E. Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such individual is available and willing, he shall serve as the arbitrator.  If more than one such individual is available and willing, the Parties will mutually determine which of those so available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator will be selected by the AAA from the foregoing list in accordance with the listing, striking and ranking procedure in the Rules, with each Party being given a limited number of strikes, except for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

24

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)     Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)     Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)     The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

25

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)     The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)     Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)     With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.     **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

Mark S. Hirsch, Esq.

The Trump Group

41 Madison Avenue, Suite 4101

New York, NY 10010

Phone: (212) 838-1000

E-mail: mhirsch@trumpgroup.com

**With Copy to:**

Thomas J. Allingham II, Esq.

Anthony W. Clark, Esq.

Douglas D. Herrmann, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP

One Rodney Square

P.O. Box 636

Wilmington, DE 19899

Phone: (302) 651-3000

E-mail: thomas.allingham@skadden.com

27

E-mail: anthony.clark@skadden.com

E-mail: douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017


[]


**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail: wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017


29

17.     **Entire Agreement.** This Agreement contains the entire agreement between the Parties concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all drafts of this Agreement are strictly confidential and shall supplement and complement any protection, which may attach to the exchange of confidential information in settlement discussions, whether by common law or statute including, but not limited to, Federal Rule of Evidence 408 and comparable state laws. Any and all prior discussions and agreements between the Parties concerning the subject matter of this Agreement are merged into this Agreement when signed. This Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by all Parties. No Party has made any warranty or representation to the other Parties that is not set forth expressly herein. In entering into this Agreement, no Party has relied on any statement or representation made by or on behalf of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such other Party that is not set forth expressly in this Agreement.

18.     **No Drafting Presumption.** This Agreement shall be interpreted or construed without any presumption that the provisions hereof should be strictly construed against the drafter, it being agreed that the Parties and their respective counsel and other agents have fully and equally participated in the preparation, negotiation, review and approval of all provisions of this Agreement.

19.     **No Admissions.** The Parties have executed this Agreement for the sole purpose of settling and disposing of all Claims between them, and it is expressly understood and agreed that no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

20. **Binding Effect.** It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein. Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21. **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22. **Execution in Counterparts and by PDF e-mail.** This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23. **Effective Date.** This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                     **Arie Genger**

By: _____            _____

Print: _____               Date: ___6/15/13___

Title: _____

Date: _____


**Glenclova Investment Co.**              **Orly Genger (in her individual capacity and**
                                          **in her capacity as beneficiary of the**

By: _____            **Orly Genger 1993 Trust)**

Print: _____               _____

Title: _____               Date: ___6/15/13___

Date: _____

32

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                                          **Arie Genger**

By: _~Mark S Hirsch~_____                    _____

Print: _MARK J. HIRSCH_____                    Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____


**Glenclova Investment Co.**                          **Orly Genger (in her individual capacity and**
                                                                          **in her capacity as beneficiary of the**

By: _~Mark S Hirsch~_____                     **Orly Genger 1993 Trust)**

Print: _MARK S. HIRSCH_____

Title: _Executive VP/General Counsel_                _____

Date: _June 16, 2013_____                          Date: _____

32

**New TR Equity I, LLC**                    **Arnold Broser**

By: _____             _Arnold Broser_ (signature)

Print: _____            Date: _____6/11/13_____

Title: _____

Date: _____


**New TR Equity II, LLC**                   **David Broser**

By: _____             _David Broser_ (signature)

Print: _____            Date: _____6/16/13_____

Title: _____

Date: _____

33

**New TR Equity I, LLC**           **Arnold Broser**

By: _Mark S Hirsch_           _____

Print: _MARK S. Hirsch_           Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_


**New TR Equity II, LLC**           **David Broser**

By: _Mark S Hirsch_           _____

Print: _MARK S. Hirsch_           Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

33

**Trans-Resources, LLC**

By: _Mark S Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

34

**Jules Trump**

Date: 6/16/2013

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: June 16, 2013

EXHIBIT A

*6/16/13*
*Draft - Confidential*

## [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

TRANS-RESOURCES

### SUBORDINATED NOTE

$7,500,000.00                                                    June ___, 2013

         **FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "Maker"), hereby promises to pay to the order of [_____] (the "Payee"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

         1.       Notes. This Subordinated Note (this "Note") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June ___, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "Settlement Agreement"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

         2.       No Interest. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

         3.       Maturity. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "Maturity Date"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "Extended Maturity Date") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.      Optional Prepayments.  The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.      Adjustment.  In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs.  The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.      Subordination.  Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.      Enforcement.  The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.      Amendments.  No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.  This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.      Lost Notes, etc.  If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

10.    <u>ASSIGNMENT</u>.  THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

11.    <u>Binding Effect</u>.  The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

Error! Unknown document property name.

**IN WITNESS WHEREOF**, the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC


By:_____
    Name:
    Title:

4





**GRANTED**



## IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust,                         :

              Plaintiff,                        :

        v.                                      :

TR INVESTORS, LLC, GLENCLOVA                    :
INVESTMENT CO., NEW TR EQUITY I,               :
LLC, NEW TR EQUITY II, LLC,                     :
TRANS-RESOURCES, INC., and                      :
TPR INVESTMENT ASSOCIATES, INC.                 :

              Defendants.                       :

_____         :        C.A. No. 6906-CS

                                                :
TR INVESTORS, LLC, GLENCLOVA                    :
INVESTMENT CO., NEW TR EQUITY I,               :
LLC, NEW TR EQUITY II, LLC, and                :
TRANS-RESOURCES, INC.,                          :

                                                :
              Counterclaim and Crossclaim       :
              Plaintiffs,                        :
        v.                                      :

                                                :
DALIA GENGER, as Trustee of the                 :
Orly Genger 1993 Trust,                         :

                                                :
              Counterclaim Defendant,           :

                                                :
     and                                        :

                                                :
TPR INVESTMENT ASSOCIATES, INC.,                :

                                                :
              Crossclaim Defendant              :


_____

TPR INVESTMENT ASSOCIATES, INC.,                :
              Counterclaim and Crossclaim       :
              Plaintiff,                         :
                                                :

v.                                          :
                                            :
DALIA GENGER, as Trustee of the             :
Orly Genger 1993 Trust,                     :
                                            :
          Counterclaim Defendant,           :
                                            :
     and                                    :
                                            :
TR INVESTORS, LLC, GLENCLOVA               :
INVESTMENT CO., NEW TR EQUITY I,           :
LLC, NEW TR EQUITY II, LLC, and            :
TRANS-RESOURCES, INC.,                      :
                                            :
          Crossclaim Defendant              :

---

## STIPULATION AND PROPOSED ORDER OF DISMISSAL

Plaintiff/Counterclaim Defendant Dalia Genger, as Trustee of the Orly Genger 1993 Trust (the "Trustee of the Orly Trust"), Defendants/Counterclaim and Crossclaim Plaintiffs/Crossclaim Defendants TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources, Inc. (collectively, the "Trump Group") and Defendant/Counterclaim and Crossclaim Plaintiff/Crossclaim Defendant TPR Investment Associates, Inc. ("TPR"), through the undersigned counsel, pursuant to Chancery Court Rules 41(a)(1)(ii) and 41(1)(c), hereby stipulate and agree as follows:

1. In the action styled *TR Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (the "3994 Action"), the Court found that (i) the transfers in October 2004 of Trans-Resources, Inc. ("Trans-Resources) stock out of TPR were in violation of the March 2001 Stockholders Agreement among Trans-Resources, TPR, TR Investors, LLC and Glenclova Investment Co., (ii) the transfers were void and the

stock reverted to TPR, and (iii) the Trump Group had the right to buy all of the improperly transferred Trans-Resources stock from TPR. These determinations and findings were essential to the Court's determinations and findings in the 3994 Action.

2. The Trump Group, having closed on the purchase of the so-called Orly Trust Shares (representing 1102.8 shares of Trans-Resources stock) pursuant to and under the terms of the Side Letter Agreement between TPR and the Trump Group entered into in August 2008, as was the Trump Group's right under that agreement, owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR to the Orly Genger 1993 Trust. As a result, the Trump Group owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of Trans-Resources.[1]

3. The $10,314,005 plus accrued interest in proceeds from the sale referenced in paragraph 2 above currently held in escrow (the "Sale Proceeds") shall remain in escrow, pursuant to that Escrow Agreement between and among all of the parties hereto, Orly Genger, as beneficiary of the Orly Trust, and Pedowitz & Meister LLP, as escrow agent, until such time as a court in New York shall direct the disposition of the Sale Proceeds, or as the parties to such Escrow Agreement shall otherwise jointly agree, provided that the escrow agent may interplead the Sale

---

[1] This amount equals 5,676.4428 Trans-Resources shares and includes all of the shares that were determined to be owned by the Trump Group in the 3994 Action, in the action captioned *TR Investors v. Genger*, C.A. No. 6697-CS (Del. Ch.) and that are the subject of the above-captioned litigation.

Proceeds into a court in New York at any time. Upon the so-ordering of paragraphs 1-2 above concerning beneficial ownership, the Trump Group shall disclaim any and all claims to the Sale Proceeds and any and all rights under the Escrow Agreement. Nothing herein shall constitute an adjudication of any claim for monetary damages pending in any other Court.

4. The claims brought on behalf of the Orly Genger 1993 Trust by the Trustee of the Orly Trust against the Trump Group are dismissed with prejudice and the claims brought by the Trump Group against the Orly Trust and TPR are dismissed with prejudice.

5. The claims brought by TPR for the Sale Proceeds against the Trustee of the Orly Trust and the Trump Group have already been dismissed without prejudice.

6.  Each party shall bear its own costs.

/s/ *Thomas J. Allingham*                       /s/ *Colm F. Connolly*
Thomas J. Allingham II (I.D. No. 476)      Colm F. Connolly (I.D. No. 3151)
Anthony W. Clark (I.D. No. 2015)           Amy M. Dudash (#5741)
Douglas D. Herrmann (I.D. No. 4872)        MORGAN, LEWIS & BOCKIUS LLP
Amy C. Huffman (I.D. No. 5022)             The Nemours Building
SKADDEN, ARPS, SLATE,                      1007 North Orange Street
    MEAGHER & FLOM LLP                     Suite 501
One Rodney Square                          Wilmington, Delaware 19801
P.O. Box 636                               (302) 574-3000
Wilmington, Delaware 19899-0636
(302) 651-3000

*Attorneys for TR Investors, LLC, Glenclova*   *Attorneys for TPR Investment Associates,*
*Investment Co., New TR Equity I, LLC,*        *Inc.*
*New TR Equity II, LLC, and Trans-*
*Resources, Inc.*

/s/ *Jeremy D. Anderson*
Jeremy D. Anderson (I.D. No. 4515)
Joseph B. Warden (I.D. No. 5401)
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, Delaware 19899

*Attorneys for Dalia Genger, as Trustee of*
*the Orly Genger 1993 Trust*

IT IS SO ORDERED this _____ day of _____, 2013.

_____
Chancellor Leo E. Strine, Jr.

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 53943155 |
| **Current Date:** | Aug 30, 2013 |
| **Case Number:** | 6906-CS |
| **Case Name:** | Genger, Dalia vs T R Investors LLC |
| **Court Authorizer:** | Strine, Leo E |

/s/ Judge Strine, Leo E

# FISH & RICHARDSON P.C.

17TH FLOOR
222 DELAWARE AVENUE
P.O. BOX 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

August 9, 2013

Jeremy D. Anderson
302 778-8452

Email
janderson@fr.com

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

HOUSTON

MUNICH

NEW YORK

SILICON VALLEY

SOUTHERN CALIFORNIA

TWIN CITIES

WASHINGTON, DC

*Via LexisNexis File & ServeXpress and*
*Hand Delivery*

The Hon. Leo E. Strine, Jr.
Chancellor
COURT OF CHANCERY
New Castle County Courthouse
500 North King Street, Suite 1551
Wilmington, DE 19801

Re:  *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v.*
     *TR Investors, LLC, et al.,* C.A. No. 6906-CS

Dear Chancellor Strine:

During the status conference with the Court on August 1, 2013, Your Honor ordered me to confer with Dalia Genger regarding her willingness to agree to settle the above-captioned case.  Having done so, I can report back to the Court that Dalia desires to settle this action.  However, as trustee of the Orly Genger Trust, Dalia needs to understand Orly's position regarding the Trust's beneficial ownership of the shares, particularly in light of preliminary injunctions issued by the New York courts.

We have reason to believe that Orly's position was disclosed in a Settlement Agreement with the Trump Group in one of the New York cases, but the Trustee has not been provided a copy of that agreement.  While the Settlement Agreement apparently was made confidential by the parties, Mr. Allingham represented to the Court that the Trump Group is willing to produce the agreement if so ordered.  Once the Trustee understands Orly's position, she will be in a position to conclude whether to agree that the shares of Trans-Resources stock transferred by TPR to the Orly Genger 1993 Trust are beneficially owned by the Trump Group.

Alternatively, if Orly gives the Trustee written consent to sign the enclosed stipulation of dismissal, the Trustee will immediately execute the stipulation in the form attached.  Counsel for Dalia, TPR and the Trump Group discussed the best way to approach Orly to get her written consent to the stipulation of dismissal and decided that Mr. Allingham, given that he settled one of the New York cases with Orly, should be the intermediary.  While Orly has not yet provided her written consent, it is

FISH & RICHARDSON P.C.

The Hon. Leo E. Strine, Jr.
August 9, 2013
Page 2

my understanding from Mr. Allingham that Orly intends to submit a letter to the
Court – on which I expect that she will copy Dalia – regarding her position as to the
stipulation of dismissal.

Respectfully yours,

/s/ Jeremy D. Anderson

Jeremy D. Anderson
Delaware Bar No. 4515

JDA/phb
Enclosure – form of Stipulation of Dismissal

Cc (w/encls.) (*via LexisNexis File & ServeXpress*):
        Thomas J. Allingham II (DE Bar #476)
        Douglas D. Herrmann (DE Bar #4872)
        Colm F. Connolly (DE Bar #3151)
        Amy M. Dudash (DE Bar #5741)

GLENCLOVA INVESTMENT CO., TR
INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW
TR EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP, MARK HIRSCH, and TRANS-
RESOURCES, INC.,

        Counterclaimants, Cross-Claimants, and Third-
        Party Plaintiffs,

        - against –

ARIE GENGER, ORLY GENGER, SAGI GENGER,
TPR INVESTMENT ASSOCIATES, INC., THE
SAGI GENGER 1993 TRUST, WILLIAM DOWD,
ARNOLD BROSER, DAVID BROSER, and ONE OR
MORE ENTITIES DIRECTED, OWNED OR
CONTROLLED BY ARNOLD BROSER AND/OR
DAVID BROSER,

        Counterclaim, Cross-Claim, and/or Third-Party
        Defendants.

Index No. 651089/2010

Order to Sever

WHEREAS, on January 2, 2013, the Clerk entered an Amended Decision and Order of

this Court that (i) dismissed all of Plaintiffs claims against Defendants Dalia Genger, Rochelle

Fang, individually and as trustee of the Sagi Genger 1993 Trust, and the Sagi Genger 1993 Trust;

(ii) dismissed Plaintiffs' first, second, fourth (rescission only), fifth, ninth and tenth causes of

action against Sagi Genger ("Sagi"); (iii) dismissed Plaintiffs' first, second, third, fourth

(rescission only), fifth, sixth and tenth causes of action against TPR Investment Associates, Inc.

("TPR"); and (iv) dismissed Plaintiffs' first, second, third (conspiracy only), fourth (rescission

only), fifth, eighth and tenth causes of action against Defendants Glenclova Investment

Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump,

Eddie Trump and Mark Hirsch (collectively, the "Trump Group");

1

WHEREAS, pursuant to a stipulation So-Ordered by the Court on July 1, 2013, all of Plaintiffs' remaining claims against the Trump Group were discontinued with prejudice;

WHEREAS, on July 24, 2014, the Appellate Division, First Department issued an Order dismissing Plaintiffs' remaining claims against Sagi and TPR; and

WHEREAS, on October 23, 2014 the Appellate Division, First Department issued an Order denying Plaintiffs' motions for reargument or leave to appeal to the Court of Appeals;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      Plaintiffs' Third Amended and Supplemental Complaint is dismissed in its entirety with prejudice, including all claims and causes of action stated therein, and without prejudice to Plantifs' right to seek leave to appeal to the Court of Appeals from the July 24, 2014 Order of the Appellate Division.

2.      The Cross-Claims, Counterclaims and Third-Party Claims of Sagi Genger, individually and as assignee of the Sagi Genger 1993 Trust, and TPR Investment Associates, Inc., as well as the Counterclaims, Cross-Claim and Third-Party Claims of Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch and Trans-Resources, Inc. are hereby expressly severed from this action.

DATED:  New York, New York
November 3, 2014

_____
Barbara Jaffe, J.S.C.

2

**MITCHELL SILBERBERG & KNUPP LLP**

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

**MS&K**

Lauren J. Wachtler
ljw@msk.com

October 31, 2014

**VIA ECF**

Honorable Barbara Jaffe
Supreme Court of the State of New York
80 Centre Street
New York, NY 10007

**Re: Genger v Genger Index No. 651089/2010**

Dear Justice Jaffe:

As previously discussed, enclosed for Your Honor's signature is a proposed order severing the main action, which has been dismissed from the counterclaim in this case. We would appreciate Your Honor signing the Order at your earliest convenience..

Respectfully submitted,

Lauren J. Wachtler, of
MITCHELL SILBERBERG & KNUPP LLP

LJW/nst

CC: All Counsel

6468559.1/43419-00004

12 East 49th Street, 30th Floor, New York, New York 10017-1028
Phone: (212) 509-3900 Fax: (212) 509-7239 Website: WWW.MSK.COM



TRUST AGREEMENT

BETWEEN

ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

Dated:  December  *13* , 1993

Copy 2 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN
30 ROCKEFELLER PLAZA · NEW YORK, N.Y. 10112

P2/43                                    <<0290062121   Sagi A. Genger   2007-04-16 17:00

Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER . . . . . . . . . . . . . . . . | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER . . . . . . | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living . . . . . . . . . . | 9 |
| FOURTH: | Additions to the Trusts . . . . . . . . . . . | 13 |
| FIFTH: | Irrevocability . . . . . . . . . . . . . . | 13 |
| SIXTH: | Governing Law . . . . . . . . . . . . . . | 13 |
| SEVENTH: | Trustees . . . . . . . . . . . . . . . . | 13 |
| EIGHTH: | Compensation of Trustees . . . . . . . . . | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees . . . . . . . . . . | 18 |
| TENTH: | Definitions . . . . . . . . . . . . . . . . | 21 |
| ELEVENTH: | Administrative Powers . . . . . . . . . . . | 22 |
| TWELFTH: | Provisions Relating to the GST . . . . . . . | 32 |
| THIRTEENTH: | Release of Powers . . . . . . . . . . . . . | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses . . . . . . . . . . . | 38 |
| FIFTEENTH: | Headings . . . . . . . . . . . . . . . . | 39 |
| SIXTEENTH: | Severability . . . . . . . . . . . . . . . | 39 |

TRUST AGREEMENT dated December /3 , 1993, between ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804 Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne, Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the Trustees hereby acknowledge receipt of, the sum of Six Hundred Thousand Dollars ($600,000.00), to be held, administered and disposed of in accordance with the provisions of Article FIRST hereof. Said sum and any other property that may be received by the Trustees pursuant to the provisions of Article FOURTH hereof, and all investments and reinvestments thereof, and all proceeds thereof which constitute principal, are hereinafter collectively called "principal."

This Trust Agreement shall be known as the "Orly Genger 1993 Trust Agreement" and the trust created by Article FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:  Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER.

A.   The Trustees shall hold, manage, invest and rein-vest the principal of the trust created by this Article, IN TRUST, and, so long as the Grantor's daughter, ORLY GENGER, shall live, the Trustees are authorized and empowered to pay such part, parts or all, if any, of the net income of the trust

created by this Article (hereinafter referred to in this Article as "Orly's Trust") to, or apply such part, parts or all, if any, of such net income for the use or benefit of, such one or more of the following individuals living from time to time in such equal or unequal amounts or proportions, and at such time or times, as the Trustees, in their discretion, shall determine:

        1.    The Grantor's daughter, ORLY GENGER.

        2.    Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so paid to or applied and, at least annually, add such net income to the principal of Orly's Trust.

        In making such distributions, the Trustees are requested (but they are not directed) to limit the total amount of the distributions made to any descendant of ORLY GENGER with respect to any calendar year to the amount necessary to increase such descendant's taxable income for United States income tax purposes for such year to the greatest amount that shall still result in such descendant not being subject to United States income taxes at the highest marginal rate in effect for such year, after taking into account all of such descendant's other income and deductions for such year.

        B.    The Trustees are authorized and empowered to pay to, or apply for the use or benefit of, the Grantor's said daughter such part, parts or all, if any, of the principal of Orly's Trust, and at such time or times, as said Trustees, in

-2-

their discretion, shall determine, without regard to the inter-
est in the trust of any other person and without regard to the
fact that any such payment or application may result in the
termination of Orly's Trust.

C.   Upon the death of the Grantor's said daughter,
the Trustees shall pay the then principal of Orly's Trust,
together with all net income thereof then accrued but not yet
collected, and collected but not yet disposed of, as follows:

1.   The Trustees shall pay one-half (1/2) of
such income and principal, in such equal or unequal amounts or
proportions, to or for the use or benefit of such one or more of
the descendants of the Grantor's said daughter, and upon such
terms, conditions and trusts, if any, as the Grantor's said
daughter, by a provision in her Will expressly referring to this
Article of this Trust Agreement, shall validly direct and
appoint. If, or to the extent that, the Grantor's said daughter
shall fail so validly to direct and appoint such principal and
income, the Trustees, at the death of the Grantor's said daugh-
ter, shall pay the same, per stirpes, to such of the descendants
of the Grantor's said daughter as shall survive her, subject,
however, to the provisions of Article SECOND hereof, or, if no
descendant of the Grantor's said daughter shall survive her, per
stirpes, to such of the Grantor's descendants as shall so sur-
vive, or, if no descendant of the Grantor shall so survive, in
accordance with the provisions of Article THIRD hereof.

-3-

2.    The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3.    If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.    Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income beneficiaries of Orly's Trust, such Trustee shall not, in his or her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:  Continuing Trusts for
Descendants of the Grantor's Daughter,
ORLY GENGER.

A.    If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant.  Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty-one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

-5-

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust, and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descendant's trust, together with all net income thereof accrued but *not yet collected, and collected but not yet disposed of, as* follows:

-6-

1.    The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint.  If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.    The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

        3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor subject to the provisions of this Article, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant subject to the provisions of this Article but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

- 8 -

D.   Notwithstanding anything herein to the contrary, each trust created by the terms of this Article shall terminate, if not sooner terminated, upon the expiration of twenty-one (21) years after the death of the last surviving descendant of the Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have been in being on the date hereof; and the Trustees shall thereupon pay the then principal of any trust terminated in accordance with the provisions of this Section, together with all net income thereof accrued but not yet collected and collected but not yet disposed of, to the descendant of the Grantor with respect to whom such trust is being held.

THIRD:   Disposition of Property if No Descendant of the Grantor is Living.

A.   As used in this Article:

1.   The words "such time" shall mean the time as of which any property is directed to be paid in accordance with the provisions of this Article.

2.   The term "Qualified Charitable Organization" shall mean an organization that shall be qualified as an organization to which contributions and bequests are deductible for both United States income tax, gift tax and estate tax purposes under the provisions of Section 170, Section 2522 and Section 2055 of the Internal Revenue Code.

-9-

B.   If, under any provision of this Trust Agreement,
any property is directed to be paid in accordance with the pro-
visions of this Article, the Trustees shall pay such property as
follows:

1.   If the Grantor, the Grantor's spouse and/or
any one or more descendants of the Grantor shall have caused
there to be created a foundation known as The Genger Foundation,
and if at such time said Foundation shall be in existence and
shall be a Qualified Charitable Organization, then, in such
event, the Trustees shall pay such property to said Foundation.

2.   If at such time either The Genger Foundation
created as aforesaid shall not be in existence or said Founda-
tion shall be in existence but shall not be a Qualified Charit-
able Organization, and if at such time the Trustees are autho-
rized under applicable law to cause to be organized a corpora-
tion under and in accordance with the laws of any state of the
United States which the Trustees, in their discretion, shall
select, which corporation (i) shall be known by the name of The
Genger Foundation (or by such other name as the Trustees, in
their discretion, shall select if the name of The Genger Founda-
tion shall not be available to be utilized as the name of said
corporation), (ii) shall have as its purposes the encouragement,
promotion, support and enhancement of non-orthodox study and
education for children in the State of Israel pertaining to the
customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and use all of the net income thereof received from time to time, for the encouragement, promotion, support and enhancement of such study and education for children, (iii) shall be required to maintain all of the property held by it, and use all of the net income thereof received from time to time, for such purposes, with such property and income to be expended for such purposes in such amounts, at such time or times and to or for the use or benefit of such recipient or recipients as the directors, trustees and/or the officers of such corporation shall, in their discretion, determine from time to time, subject, however, to the other provisions of this paragraph 2, (iv) shall have as its initial directors or trustees the Trustees hereunder, the Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325 Lindenmere Drive, Merrick, New York), if he shall not then be a Trustee hereunder, and also such other individual or individuals, if any, as may be designated by the Trustees, and thereafter to have as directors or trustees such individuals as shall from time to time be determined as provided for in the certificate of incorporation and/or by-laws of said corporation, and (v) shall be organized and maintained in such manner as to be and continue to be a Qualified Charitable Organization, then, in such event, the Trustees shall organize such a corporation, and the Trustees shall pay such property to such corporation.

-11-

3.    If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel *pertaining to the customs, practices and ancient and modern* history of the Jewish people.

-12-

FOURTH:   Additions to the Trusts.

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH:   Irrevocability.

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:   Governing Law.

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH: Trustees.

A.   The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.   Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

or appointed pursuant to the provisions of this Section B) is
authorized and empowered to appoint another individual (other
than the Grantor) to act in his or her place and stead as a
Trustee hereunder.  Each appointment of a successor Trustee
hereunder shall be made by the execution of an instrument of
appointment signed and acknowledged by the individual who shall
have made such appointment and by delivering such instrument in
accordance with the provisions of Section G of this Article; and
any such appointment may be revoked in the same manner by the
individual Trustee who shall have made it at any time before the
occurrence of the event or events as of which such appointment
shall, by its provisions, become effective.  Any appointment
made in accordance with the provisions of this Section B shall
be valid only if the individual so appointed shall, within
thirty (30) days after the later of (i) the date on which a copy
of such instrument of appointment is so delivered to him or her,
and (ii) the occurrence of the event or events as of which such
appointment shall, by its provisions, become effective, qualify
as a successor Trustee under this Trust Agreement in accordance
with the provisions of Section D of this Article.  Each succes-
sor Trustee named in Section C of this Article or appointed in
accordance with the provisions of this Section B shall be vested
with the same powers and authority as the initial Trustees who
are parties to this Trust Agreement; provided, however, that no
such Trustee shall be permitted to exercise any authority or

-14-

power which such Trustee shall be prohibited from exercising by an express provision of this Trust Agreement.

C. 1. If either LAWRENCE M. SMALL or SASH A. SPENCER shall cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road, Great Neck, New York 11023) shall act as Trustee hereunder.

2. If MARTIN A. COLEMAN shall fail or cease cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, THOMAS G. HARDY (now residing at 935 Park Avenue, New York, New York 10028) shall act as a Trustee hereunder.

D. Each successor Trustee hereunder shall qualify as such by accepting the trusteeship by the execution of a signed and acknowledged instrument of acceptance and by delivering such instrument in accordance with the provisions of Section G of this Article.

E. Any individual Trustee hereunder may resign as such a Trustee by the execution of a signed and acknowledged instrument of resignation and by delivering such instrument in accordance with the provisions of Section G of this Article.

-15-

Any such resignation shall become effective upon the receipt of
such instrument of resignation by each individual to whom it is
delivered or mailed as aforesaid or at such later date as may be
specified therein.

        F.   If any individual while acting as a Trustee here-
under shall become incapable of discharging his or her responsi-
bilities and duties as such a Trustee by reason of a physical,
emotional or intellectual incapacity and such incapacity shall
be confirmed by each of two medical doctors in written state-
ments, copies of which shall be delivered or mailed as hereinaf-
ter provided, the individual who is so incapacitated shall be
deemed for the purposes of construing and applying all of the
provisions of this Trust Agreement to have effectively resigned
as such Trustee in compliance with the provisions of Section E
of this Article, such resignation to be deemed to be effective
upon the delivery or mailing of the aforesaid statements as
hereinafter provided.  Each of the aforesaid statements shall be
signed and acknowledged by the medical doctor making the same
and copies of the same shall be delivered or mailed by regis-
tered or certified mail to the individual, if any, who will
become the successor Trustee hereunder in the place and stead of
the incapacitated Trustee to whom such statement pertains, to
each Trustee, if any, then acting hereunder (other than the
incapacitated Trustee to whom such statement pertains), and also
to either (i) the Grantor (or, if the Grantor shall not then be

-16-

living, to the executors, administrators or personal representa-
tives of the Grantor's estate), or (ii) any one or more of the
adult individuals to whom or for whose use or benefit the income
of any trust hereunder may then be paid or applied.

G.   Each instrument directed to be delivered in
accordance with the provisions of this Section G shall be deliv-
ered in person or by mailing a copy of the same by registered or
certified mail to each Trustee, if any, then acting hereunder
(other than the Trustee, if any, who shall have executed such
instrument), and to either (i) the Grantor (or, if the Grantor
is not then living, to the executors, personal representatives
or administrators of the Grantor's estate), or (ii) any one or
more of the adult individuals to whom or for whose use or bene-
fit the income of any trust hereunder may then be paid or
applied.

H.   No bond or other security shall be given by or
required in any jurisdiction (whether in the State of New York
or elsewhere) of any Trustee at any time acting hereunder
(whether such Trustee is named herein or appointed pursuant to
the provisions hereof) for the faithful performance of such
Trustee's fiduciary duties in any capacity hereunder regardless
of whether such Trustee is or may become a non-resident of the
State of New York or elsewhere.

-17-

account shall be a proper administration expense of the trust to which such account relates.

B.   If any Trustee shall resign as a Trustee hereunder, the continuing Trustee, if any, or, if there is no continuing Trustee, any successor Trustee who shall have qualified to act in accordance with the provisions of Section D of Article SEVENTH hereof, may deliver to the Trustee so resigning an instrument whereby such resigning Trustee shall be released and discharged, to the extent stated therein, of and from any and all accountability, liability and responsibility for acts or omissions as Trustee.  Any such release and discharge shall be binding upon all persons, whether or not then in being, then or thereafter interested in either the income or the principal of any trust hereunder and shall have the force and effect of a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of the account of such Trustee in which jurisdiction was obtained of all necessary and proper parties. The foregoing provision, however, shall not preclude any Trustee so resigning from having his or her account judicially settled, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian

-19-

ad litem for any such party who is under a disability.   The expenses of any judicial account rendered by a Trustee who shall resign shall be a proper administration expense of the trust to which such account relates.

C.   In addition to the foregoing, the Trustees are hereby authorized, at any time and from time to time, with respect to any trust hereunder, to settle the account of the Trustees by agreement between the Trustees and the then adult individual or individuals to whom or for whose use or benefit the income of such trust may then be paid or applied and the adult or adults who would be entitled to the principal in case such trust were to terminate at the time of such agreement, excluding any such individual who is under a disability if there is a party to the agreement who is not under any disability and who has the same interest as the individual who is under a disability, which agreement shall bind all persons, whether or not then in being, then or thereafter interested in either the income or the principal of such trust.   Any such settlement shall have the same force and effect as a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of such account in which jurisdiction was obtained of all necessary and proper parties.   The expenses of any such account shall be a proper administration expense of such trust.

-20-

P 22/43          <<02970509212    Sagi A. Genger    2007-01-16 17:04

D.    To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:    Definitions.

Wherever used in this Trust Agreement:

1.    The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.    The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.    The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.    The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

every individual who is otherwise descended from such person, whether by birth, or by lawful adoption, or by a combination thereof.

5. The words "Internal Revenue Code" shall mean and refer to "the United States Internal Revenue Code of 1986 (as amended from time to time)," and any reference to a specific section, chapter or other provision of the Internal Revenue Code shall mean and refer to said section, chapter or other provision and any successor statute thereto pertaining to the same subject matter as said section, chapter or other provision.

ELEVENTH: Administrative Powers.

A. In addition to and in amplification of the powers given by law to trustees, the Trustees, but solely in their fiduciary capacities, are hereby authorized and empowered, in their discretion:

1. To sell, exchange, make contracts with respect to, grant options on or otherwise dispose of, at public or private sale, at such prices, on such terms (including sales on credit with or without security) and at such time or times as the Trustees shall determine, any property, real or personal, which may at any time form part of any trust hereunder.

2. To lease, for such periods (whether or not any such period shall extend beyond the period prescribed by law

-22-

or the probable term of any trust hereunder), on such terms and
conditions and at such time or times as the Trustees shall
determine, the whole or any portion or portions of any property,
real or personal, which may at any time form part of any trust
hereunder, whether the same be held in severalty or as
tenant-in-common with others or in a partnership, syndicate or
joint venture or otherwise, and release and convey any undivided
interest in any such property for the purpose of effecting par-
tition of the whole or any part thereof; and make, place, extend
or renew mortgages, pledges, building loan agreements or build-
ing loan mortgages upon or affecting any and all such property;
and make, execute and deliver such mortgages, pledges and agree-
ments, together with proper bonds, notes or other instruments of
indebtedness to accompany the same, and such extension or
renewal agreements, as to the Trustees shall seem necessary,
advisable or proper; and also to repair, alter, reconstruct,
build upon or improve any such property and on such terms and at
such time or times as the Trustees shall determine, give and
grant to others the right so to do, or agree in, or so modify
any lease affecting any such property that the lessee may alter,
repair, reconstruct, build upon, improve, mortgage and pledge
any such property; and generally to make, alter and modify all
agreements, leases, mortgages, pledges, building loans, sales,
exchanges, transfers and conveyances of or affecting any such
property which the Trustees shall determine to be necessary,
advisable or proper for the preservation, improvement, enhance-

-23-

ment in value of, or betterment of or addition to, such prop-
erty.

3.   To hold any part or all of the assets of any
trust hereunder invested in the same form of property in which
the same shall be invested when received by the Trustees, and
invest and reinvest the assets of any such trust, or any portion
thereof, in any form of investment which the Trustees may deter-
mine (including, without limitation, mutual funds, common trust
funds, investment trusts, general partnerships and limited part-
nerships), whether or not such investment is of the nature pre-
scribed by law as a legal investment for fiduciaries or is spec-
ulative in nature, and without regard to the percentage of the
assets of such trust which such investment or similar invest-
ments may constitute.

4.   To vote in person or by proxy all stocks and
other securities held by any trust hereunder; grant, exercise,
sell or otherwise turn to account rights to subscribe for stock
and securities and options of any nature; amortize or refrain
from amortizing premiums on bonds or other securities which the
Trustees may purchase or receive; participate in reorganiza-
tions, mergers, liquidations or dissolutions, and contribute to
the expenses of, and deposit securities with, protective commit-
tees in connection therewith; participate in voting trusts; and
generally exercise, in respect of said stock and securities, all

-24-

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

    5.    To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

    6.    In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

7.    To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.    To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.    To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.    In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.    By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

Trustees) the authority and power to (i) sign checks, drafts or orders for the payment or withdrawal of funds from any bank account or other depository in which funds of such trust shall be held, (ii) endorse for sale, transfer or delivery, or sell, transfer or deliver, or purchase or otherwise acquire, any and all stocks, stock warrants, stock rights, bonds or other securities whatsoever with respect to such trust, and (iii) gain access to any safe deposit box which may be in the names of the Trustees and remove part or all of the contents of any such safe deposit box and release and surrender the same.

12.   To pay or deliver to either parent or to the guardian of the property of any minor or to an adult with whom such minor resides, and, with respect to any person for whom it is permissible to do so under applicable law, to a custodian for such person under a Uniform Gifts to Minors Act or Uniform Transfers to Minors Act of any state until the age of eighteen (18) years (or until such age in excess of eighteen (18) years as shall be permissible under applicable law and which the Trustees, in their discretion, shall select) any sum or property, including income, which such minor or such person shall either be entitled to receive or to have applied for his or her use or benefit under any of the provisions hereof, without requiring that such parent, adult or custodian obtain letters of guardianship or that such parent, guardian, adult or custodian give any bond or other security for any such payment or delivery

-27-

so made; and the receipt or such parent, guardian, adult or custodian for the amount of such payment, or for the property so delivered, shall be an absolute protection to the Trustees and a complete release and discharge from all further accountability in respect of any such payment or delivery.

13.  If any beneficiary of any trust hereunder shall, in the opinion of the Trustees, be or become incapacitated (whether by reason of illness, age or other causes) the Trustees may, in their discretion, wholly or partly in lieu of paying net income or principal of such trust to such beneficiary as authorized or directed by this Trust Agreement, dispose of the same in one or more of the following ways:

(a)  by making payment of such net income or principal to a legally appointed guardian or other fiduciary of such beneficiary;

(b)  by making payment of such net income or principal, on behalf of such beneficiary, to any person with whom such beneficiary resides or who has charge of his or her care; and/or

(c)  by applying such net income or principal directly for the use or benefit of such beneficiary.

-28-

14.   To remove the assets of, hold and administer any such assets in, and/or move the situs of the administration of any trust hereunder to, such location or locations (which may be in a state or other jurisdiction other than the State of New York) as the Trustees, in their discretion, shall select.   If the Trustees, in their discretion, shall determine it advisable to move the situs of the administration of any trust hereunder to a location where the judicial administration of trusts is required or permitted, the Trustees are authorized to select and request a court in such location having jurisdiction over the administration of trusts to accept jurisdiction over the administration of such trust, and it is requested that such court accept, and that it be permitted to accept, jurisdiction over the administration of such trust; and it is directed that the administration of such trust shall be governed from time to time by the laws of the jurisdiction in which the administration of such trust is then located.

15.   To make, or refrain from making, elections or allocations permitted under any applicable tax law without regard to the effect of any such election or allocation on the interest of any beneficiary of any trust hereunder and, if any such election or allocation shall be made, to apportion, or refrain from apportioning, any benefits thereof among the respective interests of the beneficiaries of such trust, all in such manner as the Trustees shall deem appropriate.

-29-

16. To retain or invest _in solido_ the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17. To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B. No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C. Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

D.   Wherever in this Trust Agreement it is provided
that an instrument is to be "acknowledged," such instrument
shall be acknowledged in such manner as would be required if the
same were a conveyance of real property entitled to be recorded
in the State of New York.

E.   1.   To the fullest extent permitted by law, no
transaction or decision involving any trust hereunder shall be
deemed invalidated in any way by reason of any personal, benefi-
cial or other interest which any Trustee may have with respect
to such transaction or decision, including, without limitation,
any transaction or decision with respect to any corporation,
company, partnership, association, estate, trust or other entity
in which any Trustee may have an interest in a capacity other
than as a Trustee hereunder, regardless of any conflict of
interest as to any such transaction or decision, and any such
transaction or decision shall be lawful and proper and shall not
be questioned unless such Trustee is guilty of fraud with
respect thereto.   Without limiting the foregoing, no Trustee
shall be disqualified or barred from acting as such or have any
liability hereunder in exercising any power, authority or dis-
cretion conferred upon the Trustees by reason of the fact that
such Trustee may be a stockholder, officer, director, partner,
executor, administrator, personal representative, trustee, bene-
ficiary, or in any other way interested in the corporation, com-
pany, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.    The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.    The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:   Provisions Relating to the GST.

A.    As used in this Article:

1.    "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-32-

2.   The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3.   The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary, and (ii) to limit such power, by formula or otherwise, to less than all of the property held in such trust at the death of such beneficiary; provided, however, that with respect to each such trust, the maximum amount of property over which such power may be created shall not, after taking into account the property, if any, over which any other such power is created in such beneficiary, exceed the amount, if any, above which any further addition to the amount subject to such power would increase the Net Death Taxes determined with respect to such beneficiary's estate by an amount equal to or greater than the net decrease in the aggregate of (x) the GST and (y) any state and/or local tax on generation-skipping transfers imposed as a result of the death of such beneficiary that would result from such further addition.   Unless such beneficiary's Will otherwise provides by express reference to this Trust Agreement and such power, the increase in the Net Death Taxes on such beneficiary's estate resulting from such power shall be paid from that part of the principal of such trust over which such power is exercisable. If, or to the extent that, such beneficiary shall fail so expressly and so validly to exercise any power created in such beneficiary by the Trustees pursuant to the provisions of this paragraph, the unappointed portion (or, as the case may be, all) of the property subject to such power shall pass pursuant to the provisions of this Trust Agreement otherwise applicable to such property.

-34-

2.   The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power.  The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

inclusion ratio of zero, and if any property which is directed
to be added to a trust hereunder shall have an inclusion ratio
which is different than the inclusion ratio of such trust, the
Trustees shall not make such addition but shall instead admin-
ister such property in a separate trust under this Trust Agree-
ment; and, in each such instance, the property to be placed or
held in such a separate trust shall be held, administered and
disposed of by the Trustees pursuant to provisions identical to
the provisions of the trust to which, but for the provisions of
this paragraph 1, such property would have been placed or added.

    2.  If, pursuant to the provisions of paragraph
1 of this Section C, any property that would otherwise be held
in a single trust hereunder is instead held in separate trusts
hereunder, the Trustees of such trusts may, at any time or from
time to time, (i) make different tax elections and allocations
with respect to each such trust, (ii) expend principal and
income and exercise any discretionary power differently with
respect to each such trust, (iii) invest each such trust differ-
ently, and/or (iv) take all other actions consistent with such
trusts being separate entities.  Furthermore, the donee of any
power of appointment with respect to such trusts may exercise
such power differently with respect to each such trust.

    D.  Notwithstanding the provisions of the foregoing
Sections of this Article to the contrary, if any Trustee here-
under is a current beneficiary of the income of any trust here-

-36-

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

      THIRTEENTH:    <u>Release of Powers</u>.

      Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

Grantor's estate), or (iii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.  In the event of the release of any such power by any Trustee, the remaining Trustee or Trustees hereunder, if any, may thereafter exercise such power, other than any discretionary power which was not initially vested in such remaining Trustee or Trustees.  The release of any power by any Trustee hereunder pursuant to the provisions of this Article shall not be binding upon any Trustee who may thereafter act as a Trustee hereunder unless such power shall have been released by all of the Trustees then in office who are vested with such power by their execution of a signed and acknowledged instrument specifically providing that such release is to be binding upon all successor Trustees hereunder.

FOURTEENTH:    Provision With Respect To
               Closely Held Businesses.

Without limiting the powers and authority conferred upon the Trustees by Article ELEVENTH hereof but in extension thereof, the Trustees are specifically authorized and empowered, in their discretion, to retain for as long as they, in their discretion, shall deem advisable, any or all shares of stock in any closely held corporation, or any indebtedness owing by any such corporation, or any or all interests in any proprietorship, unincorporated business, partnership, joint venture, realty or

-38-

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:   Headings.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:   Severability.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

-39-

part, clause, provision or condition had not been contained
herein.

WITNESS the due execution hereof by the Grantor and
Trustees on the day and year first above written.

ARIE GENGER,
as Grantor

LAWRENCE M. SMALL,
as Trustee

SASH A. SPENCER,
as Trustee

-40-

P 42/43                        << 12127506620       Sagi A. Genger      2007-01-16 17:09

STATE OF NEW YORK    )
                     )   SS.:
COUNTY OF NEW YORK   )

On this /3 day of December, 1993, before me person-
ally appeared ARIE GENGER, to me known and known to me to be a
person described in and who executed the foregoing instrument,
and he duly acknowledged to me that he executed the same.

_____
Notary Public

BRIT GEIGER
Notary Public, State of New York
No. 24-4502318 Qual. in Kings Co.
Certificate Filed in New York County
Commission Expires June 30, 19__

*District of Columbia*
~~STATE OF~~          )
                     )   SS.:
~~COUNTY OF~~         )

On this /5ᵗʰ day of December, 1993, before me person-
ally appeared LAWRENCE M. SMALL, to me known and known to me to
be a person described in and who executed the foregoing instru-
ment, and he duly acknowledged to me that he executed the same.

*Jeanne M. Meister*
Notary Public

My Commission Expires July 31, 1997

STATE OF *New York*  )
                     )   SS.:
COUNTY OF *New York* )

On this /6ᵗʰ day of December, 1993, before me person-
ally appeared SASH A. SPENCER, to me known and known to me to be
a person described in and who executed the foregoing instrument,
and he duly acknowledged to me that he executed the same.

*Stella M. Orso*
Notary Public

STELLA M. ORSO
Notary Public, State of New York
No. 24-4524037
Qualified in Kings County
Certificate Filed in New York County
Commission Expires March 30, 1994

-41-

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of the ORLY GENGER 1993
Trust,

                           Plaintiffs,

        v.

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, Individually and as Trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

                          Defendants.

Index No. 651089/2010

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT DALIA GENGER'S MOTION TO DISMISS

**PEDOWITZ & MEISTER, LLP**
**1501 Broadway, Suite 800**
**New York, NY 10036**
**Tel: (212) 403-7330**
**Fax: (212) 354-6614**
**robert.meister@pedowitzmeister.com**
**Attorneys for Defendant**

## TABLE OF CONTENTS

**Page**

FACTS                                                                                    2

Divorce Settlement Agreement                                                             3

Post-Divorce Arbitration and Final Arbitration Award                                     4

Arie Sued for Making Improper Transfers                                                  4

ARGUMENT                                                                                 6

Legal Standard                                                                           6

I.      The Claim For Reformation Based on the Language of the
        Divorce Settlement Agreement Should Be Dismissed                                 6

        a.  The Language of the Stipulation Agreement Is Inapplicable
            to Arie's Claim for Reformation                                              7
        b.  As There Was No Mutual Mistake of Fact Because Arie
            Knew and Dalia Not Know that the Required Consent of
            the Other Shareholders Had Not Been Obtained, Arie Is
            Not Entitled to Reformation or a Claim for Unjust
            Enrichment or Rescission Against Dalia                                       7

II.     Arie's Claims to Redo the Economics of the Divorce
        Stipulation are Barred by Res Judicata Arising from the
        2008 Final Arbitration Award                                                     9

III.    Arie Has Failed to Join an Indispensable Party:
        The Orly Genger 1993 Trust                                                      10

IV.     As Dalia Does Not Own Any Shares of TRI Stock, No
        Injunctions or Declaratory Judgment Preventing Her from
        Encumbering These Shares Is Inappropriate                                       13

V.      Arie is Not Entitled to Any Equitable Remedy As He
        Has Unclean Hands                                                               13

VI.     Arie's Fourth Cause of Action Seeking Unjust Enrichment
        and Rescission Should Be Dismissed                                              15

VII.    The Fifth Cause of Action for a Permanent Injunction
        Should be Dismissed                                                             16

CONCLUSION                                                                              17

# TABLE OF AUTHORITIES

## Cases

*390 W. End Associates v. Baron*, 274 A.D.2d 330, 711 N.Y.S.2d 176 (1st Dept. 2000) ............. 13

*ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 952 N.E.2d 463 (2011)............................. 6

*Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F.Supp. 969 (S.D.N.Y. 1992)......... 14

*Breslin Realty Dev. Corp. v. Shaw*, 72 A.D.3d 258, 893 N.Y.S.2d 95 (2d Dept. 2010).............. 10

*Chimart Assoc. v. Paul*, 66 N.Y.2d 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986) .................... 8

*Citibank, N.A. v. Am. Banana Co., Inc.*, 50 A.D.3d 593, 856 N.Y.S.2d 600 (1st Dept. 2008)..... 13

*Dabrowski v. Abax Inc.*, 64 A.D.3d 426, 882 N.Y.S.2d 119 (1st Dept. 2009) ............................. 15

*Dalia Genger v. TR Investors, LLC et. al.* (Del. Ch. 6906-CS, filed Oct. 4, 2011)........... 6, 11, 13

*Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 364 (S.D.N.Y. 2008) ... 14

*Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85 (2d Cir. 1998) ............................. 14

*First Natl. Bank of Amsterdam v. Shuler*, 153 N.Y. 163, 47 N.E. 262 (1897)............................. 12

*Genger v. TR Investors, LLC*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011) .............passim

*Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 841 N.E.2d 742 (2005)...................................... 15

*Goldstein v. Delgratia Mining Corp.*, 176 F.R.D. 454 (S.D.N.Y.1997)......................................... 14

*Greater New York Mut. Ins. Co. v. United States Underwriters Ins. Co.*, 36 A.D.3d 441, 827 N.Y.S.2d 147 (1st Dept. 2007)................................................................................................. 8

*Harris v. Uhlendorf*, 24 N.Y.2d 463, 301 N.Y.S.2d 53, 248 N.E.2d 892 (1969) ........................... 8

*Landau v. LaRossa, Mitchell & Ross*, 11 N.Y.3d 8 , 892 N.E.2d 380 (2008) ................................. 9

*Leon v. Martinez*, 84 N.Y.2d 83, 87, 614 N.Y.S.2d 972, 638 N.E.2d 511 (1994).......................... 6

*Matlin Patterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571 (1st Dept. 2011) ...................................................................................................................................................... 6

*Modjeska v. Greer*, 233 A.D.2d 589, 590 (3d Dep't 1996) ......................................................... 11

*Morgan Guaranty Trust Co. of New York v. Solow*, 114 A.D.2d 818, 495 N.Y.S.2d 389, aff'd. 68 N.Y.2d 779, 506 N.Y.S.2d 674, 498 N.E.2d 147 (1986)............................................................. 9

*Nat'l Distillers & Chem. Corp. v. Seyopp Corp.*, 17 N.Y.2d 12, 214 N.E.2d 361 (1966)............ 13

*Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 690 N.Y.S.2d 478, 712 N.E.2d 647 (1999) ........................................................................................................................................... 9

*Pedowitz & Meister LLP v. TPR Investment Associates, Inc. et al.*, U.D.S.D., S.D.N.Y., 11 civ. 1502 (JFK)................................................................................................................................... 12

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ...................................................................................................................... 14

*Red Hook/Gowanus Chamber of Commerce v. New York City Bd. of Standards & Appeals*, 5 N.Y.3d 452, 839 N.E.2d 878 (2005) .......................................................................................... 12

*Stonebridge Capital, LLC v. Nomura Int'l PLC*, 68 A.D.3d 546, 891 N.Y.S.2d 56 (1st Dept. 2009)................................................................................................................................................ 8

*Sud v. Sud*, 211 A.D.2d 423, 621 N.Y.S.2d 37 (1st Dept. 1995) .................................................. 6

*TR Investors, LLC v. Arie Genger, C.A.*, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009).............. 5, 15

*TR Investors, LLC v. Genger*, CIV.A. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010) *aff'd*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011)..............................................3, 5, 9, 15

*Velez v. Feinstein*, 87 A.D.2d 309, 451 N.Y.S.2d 110 (1st Dept. 1982).......................................11

*W. R. Co. v. Nolan*, 48 N.Y. 513 (1872) ............................................................................................11

*Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d 327 (2d Cir.1983)..................................................15

*Waverly Mews Corp. v. Waverly Stores Associates*, 294 A.D.2d 130, 1741 N.Y.S.2d 826 (1st Dept. 2002)...................................................................................................................................9

*William P. Pahl Equip. Corp. v. Kassis*, 182 A.D.2d 22, 588 N.Y.S.2d 8 (1st Dept. 1992) ..........8

*Xiao Yang Chen v. Fischer*, 6 N.Y.3d 94, 843 N.E.2d 723 (2005)................................................10

## Statutes

CPLR § 1003 ..........................................................................................................................................1

CPLR § 3211(a)(5)............................................................................................................................1, 9

CPLR § 3211(a)(7)............................................................................................................................1, 6

CPLR § 3211(a)(10)........................................................................................................................1, 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of the ORLY GENGER 1993
Trust,

                         Plaintiffs,

       v.

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, Individually and as Trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.

                     Defendants.

Index No. 651089/2010

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT DALIA GENGER'S MOTION TO DISMISS

      Defendant Dalia Genger (Dalia) respectfully submits this brief in support of her motion

pursuant to New York Civil Practice Laws and Rules (CPLR) §§ 3211 (a)(5); (a)(7); (a)(10) and

CPLR § 1003 to dismiss all the claims against her in the Third Amended and Supplemental

Complaint.

      Dalia Genger was the wife of plaintiff, Arie Genger.. (Since January 2008, Dalia has also

been the Trustee of the Orly Genger 1993 Trust, although the Complaint does not sue her in such

capacity.)  Their divorce action was settled by a Stipulation of Settlement (Divorce Settlement

Agreement) on October 26, 2004.  In the Divorce Settlement Agreement, Arie agreed to cause

Defendant TPR Investment Associates, Inc. (TPR) to transfer certain shares of Trans-Resources,

1

Inc. (TRI) to the Sagi Genger 1993 Trust (Sagi Trust), to the Orly Genger 1993 Trust (Orly

Trust) and to Arie himself.

In 2010, the Delaware Chancery Court held that Arie had not caused TPR to validly

transfer legal title to the TRI shares to the Sagi Genger 1993 Trust, to the Orly Genger 1993

Trust or to Arie himself, and that decision was affirmed in relevant part by the Delaware

Supreme Court in 2011. *Genger v. TR Investors, LLC,* 592, 2010, 2011 WL 2802832 (Del. July

18, 2011). That decision was premised on Arie's failure to obtain consent of the other TRI

shareholders (the Trump Group) as was required under the TRI Shareholders Agreement of

which he knew and had signed.

Now, seven years after the divorce agreement, in this proceeding Arie seeks to undo or

change various economic provisions of the Divorce Settlement Agreement because he did not do

what he was obligated to do under that agreement. He attempts to plead a variety of theories,

namely Reformation (First claim); Constructive Trust in favor of Arie purportedly on behalf of

Arie and Orly (Second Claim); Unjust Enrichment and Rescission purportedly on behalf of Arie

and Orly (Fourth Claim) and Injunction on behalf of Arie and Orly (Fifth Claim). None states a

cause of action against Dalia.

## FACTS

In 2001, Arie and TPR entered into a TRI Stockholders Agreement with TRI and its other

shareholders that prohibited Arie and TPR from transferring TRI stock to any party other than

those expressly permitted to receive such a transfer. Under this agreement, TRI shares could

transfer to Arie himself provided written notice was given the other shareholders of TRI, the

Trump Group. TRI stock was not permitted to be transferred during Arie's life to his children's

trusts, the Orly or Sagi Trusts, without giving written notice containing the terms and conditions

of the offer to the Trump Group. The Trump Group then was given the right to elect to purchase

all of the offered shares at the price offered by the prospective purchaser and specified in such notice. *TR Investors, LLC v. Genger*, CIV.A. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010) *aff'd*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011).

**Divorce Settlement Agreement**

In settlement of their divorce proceedings, on October 26, 2004, Dalia and Arie entered into the Divorce Settlement Agreement (Exhibit A to Arie's Claim). Despite Arie's knowledge of the extensive transfer restrictions placed on transfers of TRI stock, in the Divorce Settlement Agreement Arie agreed to cause TPR to transfer all of TPR's 3,000 shares of TRI common stock. The TRI shares were to be transferred as follows: (i) 794.40 shares (representing 13.99468% of TRI common stock of) to Arie; and (ii) The Orly and Sagi Trusts would each receive 1,102.80 shares of TRI Stock each (giving each trust an ownership of 19.42766% of TRI common stock). The Divorce Settlement Agreement further stated that the Orly and Sagi Trusts would execute and deliver irrevocable proxies to Arie for all of the TRI stock owned by the trust. See Divorce Settlement Agreement; Article II(9)(a)(ii) at 14.

The Divorce Settlement Agreement made no reference to the restrictions on transfers in the TRI Stockholders Agreement and did not state whether the Trump Group had notice of or consented to the transfers. To the contrary, in the Divorce Settlement Agreement, Arie affirmatively represented to Dalia that,

> [e]xcept for the consent of TPR...no consent, approval or similar action of any person is required in connection with the transfer of TRI Stock as contemplated hereby and that such transfer will not conflict with any agreement to which [Arie] is party or by which he is bound.

See Divorce Settlement Agreement; Article II(9)(a) at 13.

On October 29, 2004, TPR and Arie entered into an agreement ("Letter Agreement") with the Orly and Sagi Trusts to transfer TPR's 3,000 shares of TRI common stock in accordance with the terms of the Divorce Settlement Agreement.  Complaint Ex. A.

**Post-Divorce Arbitration and Final Arbitration Award**

In 2007 – 2008 there was an arbitration proceeding between Dalia and Arie concerning issues relating to, *inter alia*, the economics of the arrangements in the 2004 Stipulation of Settlement concerning the TRI stock transactions.    After "extensive discovery" and approximately 14 days of hearings, where each party made "extensive pre and post hearing submissions", in 2008 the Arbitrator, former Justice E. Leo Milonas, ruled that in the divorce negotiations Arie had falsely misrepresented to Dalia that the TPR's holdings of TRI stock had no value and based on his determination of the value of TRI in 2004, he awarded Dalia $3.85 million based on the shares of TRI stock that Arie was to cause TPR to transfer to himself. Arbitration Opinion, Exhibit A to the Meister Aff.

**Arie Sued for Making Improper Transfers**

On August 11, 2008, one of the TRI shareholders that was part of the Trump Group, Glencova LLC, filed suit in the Southern District of New York to enforce, *inter alia,* its rights under the Stockholders Agreement.  During the course of the litigation, the Trump Group entered an agreement with both TPR and the Sagi Trust to purchase for $26,715,416.00 the TRI shares that had allegedly been transferred to the Sagi Trust in pursuant to the Divorce Stipulation in 2004.

Subsequently, the Trump Group filed a complaint in Delaware Chancery Court pursuant to 8 *Del. C.* § 225 to determine the composition of the TRI board.  The Trump Group maintained

4

that Arie and TPR's 2004 transfers of TRI stock violated the Stockholders Agreement and, as a result, the transfers were void.

During that litigation, the Delaware Court found that Arie to be in contempt because he had violated a court order by causing evidence that was on his computer as well as TRI's computers to be intentionally destroyed. The Court sanctioned Arie by, among other things, increasing his burden of proof, requiring him to provide corroborating evidence at trial (beyond just his own testimony), requiring him to produce certain documents to the plaintiffs that he had claimed were privileged, and awarding attorneys' fees of $750,000. See *TR Investors, LLC v. Arie Genger, C.A,* 2009 WL 4696062 (Del. Ch. Dec. 9, 2009).

Thereafter the Delaware Chancery Court found that Arie and TPR had executed the transfers of TRI stock in violation of the Stockholders Agreement, and as a result neither Arie, the Orly Trust or the Sagi Trust were the record owners of any TRI shares. The Court, however, upheld the Sagi Trust's agreement with TPR and the Trump Group that transferred the shares purportedly transferred to Sagi pursuant to the Divorce Settlement Agreement to the Trump Group. Accordingly, the Trump Group was entitled to the Sagi Trust shares, giving them a 64% ownership in TRI. *TR Investors, LLC v. Genger,* CIV.A. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010) *aff'd,* 592, 2010, 2011 WL 2802832 (Del. July 18, 2011).

The Delaware Supreme Court reversed the Chancery Court's finding that the Trump Group was the record *and beneficial owner* of all the purportedly transferred TRI shares, but affirmed that TPR was the record holder of those shares without determining the beneficial ownership of the TRI Stock purportedly transferred to the Orly Trust or to Arie. *Genger v. TR Investors, LLC,* 592, 2010, 2011 WL 2802832 (Del. July 18, 2011). Thereafter, Dalia, as Trustee of the Orly Trust, brought an action in the Delaware Chancery Court to determine that the Orly

5

Trust is the beneficial ownership of the TRI Shares that TPR purported to transfer to it. *Dalia Genger v. TR Investors, LLC et. al.*, (Del. Ch. 6906-CS. filed Oct. 4, 2011). Exhibit B to Meister Affidavit.

**ARGUMENT**

**Legal Standard**

"On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction." *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 227, 952 N.E.2d 463, 474 (2011) *quoting Leon v. Martinez,* 84 N.Y.2d 83, 87, 614 N.Y.S.2d 972, 638 N.E.2d 511 (1994). Courts must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." *Id.* "However, the complaint 'must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory'". *Matlin Patterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571 (1st Dept. 2011)(citation omitted).

Under CPLR 3211(a)(7), "the facts pleaded are presumed to be true and accorded every favorable inference, nevertheless, allegations consisting of bare legal conclusions, as well as factual claims either inherently incredible or flatly contradicted by documentary evidence, are not entitled to such consideration." *Sud v. Sud*, 211 A.D.2d 423, 424, 621 N.Y.S.2d 37, 38 (1st Dept. 1995)(citation omitted).

**I     The Claim For Reformation Based on the Language of the Divorce Settlement Agreement Should Be Dismissed**

The claim for reformation appears to be brought on two theories; one purportedly based on language in the Divorce Settlement Agreement and the other purportedly based on mutual mistake of fact.  Neither is valid.

6

a. **The Language of the Stipulation Agreement Is Inapplicable to Arie's Claim for Reformation**

Article XVI of the Stipulation allows a court to sever a provision that a court declared "invalid or unenforceable by any Court of competent jurisdiction, by statute or governmental regulation" and reform the agreement accordingly.  That provision was not triggered by the Delaware decision, because it did not declare the provisions for Arie to cause TPR to transfer the TRI shares to be invalid or unenforceable.  The Delaware decision merely held that Arie had not given notice to or obtained or even sought the consent of the other shareholders for such transfer that was required by the TRI Shareholders Agreement.  Thus the reformation provision of the Stipulation was not triggered.

b. **As There Was No Mutual Mistake of Fact Because Arie Knew and Dalia Not Know that the Required Consent of the Other Shareholders Had Not Been Obtained, Arie Is Not Entitled to Reformation or a Claim for Unjust Enrichment or Rescission Against Dalia**

Here, there was no mutual mistake of fact.  "When [Arie] effectuated the 2004 Transfers, [he] knew that neither Trust was a 'Permitted Transferee' of the [TRI] shares under the Stockholders Agreement." *Genger v. TR Investors, LLC*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011).  Yet in the Stipulation (Art. II Sec. 9(a)) Arie warranted to Dalia that:

> Accept for the Consent of TPR, [Arie] further represents and warrants that no consent, approval or similar action of any person is required in connection with the transfer of TRI Stock as contemplated hereby and that such transfer will not conflict with any agreement to which [Arie] is party or by which he is bound.

As held by the Delaware Supreme Court, "[t]hat representation was false". *Genger v. TR Investors, LLC*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011).  As a party to that litigation, Arie is bound by and collaterally estopped from disputing that determination.  Thus there is no

basis for his allegation (Complaint ¶ 45) that he reasonably believed that all necessary consents had been obtained.  Therefore there could be no mutual mistake of fact.

In the case of mutual mistake, it must be alleged that "the parties have reached an oral agreement and, *unknown to either*, the signed writing does not express that agreement" *Greater New York Mut. Ins. Co. v. United States Underwriters Ins. Co.*, 36 A.D.3d 441, 443, 827 N.Y.S.2d 147, 149 (1st Dept. 2007) *citing Chimart Assoc. v. Paul*, 66 N.Y.2d at 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986)(emphasis added).  "The burden upon a party seeking reformation is a heavy one since it is presumed that a deliberately prepared and executed written instrument accurately reflects the true intention of the parties: '[T]he proponent of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.'" *Greater New York Mut. Ins. Co. v. United States Underwriters Ins. Co.*, 36 A.D.3d 441, 442-43, 827 N.Y.S.2d 147, 148 (1st Dept. 2007) (citation omittied)

A claim for mutual mistake must "allege that the parties reached an agreement that was not reflected in the transaction documents".  . A "fail[ure] to state 'exactly' what such agreement was. . .fail[s] to overcome the strong presumption against mutual mistake claims." *Stonebridge Capital, LLC v. Nomura Int'l PLC*, 68 A.D.3d 546, 548, 891 N.Y.S.2d 56, 58 (1st Dept. 2009) *leave to appeal dismissed*, 15 N.Y.3d 735, 931 N.E.2d 1057 (2010) *citing Harris v. Uhlendorf*, 24 N.Y.2d 463, 467, 301 N.Y.S.2d 53, 248 N.E.2d 892 (1969); *William P. Pahl Equip. Corp. v. Kassis*, 182 A.D.2d 22, 29, 588 N.Y.S.2d 8 (1st Dept. 1992), *lv. denied in part, appeal dismissed in part* 80 N.Y.2d 1005, 592 N.Y.S.2d 665, 607 N.E.2d 812 (1992).

To the degree that the claim for unjust enrichment and rescission is also based on a claim of mutual mistake of fact, it is defective for the same reason.

As stated by the Delaware Chancery Court, Arie "only has himself to blame for whatever mess his decision to make the 2004 Transfer has caused for his divorce settlement."  *TR Investors, LLC v. Genger*, CIV.A. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010) *aff'd*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011).

## II      Arie's Claims to Redo the Economics of the Divorce Stipulation are Barred by Res Judicata Arising from the 2008 Final Arbitration Award.

In 2007 – 2008 there was an arbitration between Dalia and Arie concerning issues relating to, *inter alia*, the economics of the arrangements in the 2004 Stipulation of Settlement concerning the TRI stock transactions.  After "extensive discovery" and approximately 14 days of hearings, where each party made "extensive pre and post hearing submissions", in 2008 the Arbitrator, former Justice E. Leo Milonas, awarded Dalia $3.85 million based on the shares of TRI stock that he was to cause TPR to transfer to himself.  Arbitration Opinion Exhibit A to the Meister Aff.  The arbitration is *res judicata* barring Arie's claims in this action against Dalia.

"The doctrines of res judicata and collateral estoppel are applicable to arbitration awards."  *Waverly Mews Corp. v. Waverly Stores Associates*, 294 A.D.2d 130, 132, 741 N.Y.S.2d 826, 827 (1st Dept. 2002) *citing Morgan Guaranty Trust Co. of New York v. Solow*, 114 A.D.2d 818, 495 N.Y.S.2d 389, *aff'd.* 68 N.Y.2d 779, 506 N.Y.S.2d 674, 498 N.E.2d 147 (1986).  Under CPLR 3211(a)(5), an action should be dismissed "because of arbitration and award".

"[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy."  *Landau v. LaRossa, Mitchell & Ross*, 11 N.Y.3d 8, 12-13, 892 N.E.2d 380, 383 (2008) quoting *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 347, 690 N.Y.S.2d 478, 712 N.E.2d 647 (1999), *id.* at 347, 690 N.Y.S.2d 478, 712 N.E.2d 647 [internal quotation

9

marks and citations omitted]. "Res judicata bars future litigation between the same parties . . . arising out of transactions giving rise to a cause of action which *could have been* raised in a . . . [prior] proceeding." *Breslin Realty Dev. Corp. v. Shaw*, 72 A.D.3d 258, 264, 893 N.Y.S.2d 95, 100 (2d Dept. 2010)(emphasis added). Determining whether claims are part of the same transaction involves a "'pragmatic' test . . . analyzing 'whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Xiao Yang Chen v. Fischer*, 6 N.Y.3d 94, 100-01, 843 N.E.2d 723 (2005) *quoting* Restatement [Second] of Judgments § 24. Since, as the Delaware Supreme Court determined, Arie *knew* that in 2004 that the transfers required consents that he had not obtained, although he falsely represented the contrary, he *could have raised* any claims about the validity of these transfers during the 2008 Arbitration, where issues regarding the worth of various items were fully discussed in detail. Because Arie chose not to raise the issues in these actions in the 2008 Arbitration action, he is barred from now relitigating these issues.

**III      Arie Has Failed to Join an Indispensible Party: The Orly Genger 1993 Trust**

The claims for reformation and constructive trust seek to take away from the Orly Genger 1993 Trust (Orly Trust) the benefits it received. Thus the Orly Trust is an indispensible party to this action. CPLR 3211(a)(10) requires the dismissal of an action when "the court should not proceed in the absence of a person who should be a party."

The Orly Trust is <u>not</u> a party to this action. Although the Complaint states that Orly Genger is suing "in her individual capacity and on behalf of the Orly Genger 1993 Trust" as beneficiary of that Trust, it does not allege any individual rights of Orly herself; only the Trust. The claims asserted against Dalia that purport to be on behalf of Orly (Second, Fourth, and Fifth

10

Claims), seek to take rights away from the Orly Trust. Indeed the claim for a constructive trust (Second Claim), seeks that Orly Trust's rights to the TRI shares be placed in a constructive trust for the benefit of *Arie*.

The rights of a beneficiary of an express trust are derivative, not direct. Only the Trust itself can assert those rights. *Modjeska v. Greer*, 233 A.D.2d 589, 590 (3d Dep't 1996) (*held: beneficiary cannot litigate rights that belong to Trust*). So that as long as a trustee is ready and willing to take the proper proceedings against a third person, a beneficiary cannot maintain a suit against the third person. *See e.g., W. R. Co. v. Nolan*, 48 N.Y. 513, 517-18 (1872). It is fundamental to the law of trusts that a beneficiary has the right, upon general principles of equity and independently of statutory provisions, to sue for the benefit of the trust only after "a showing of a demand on the trustees to bring the suit, and of a refusal so unjustifiable as to constitute an abuse of the trustee's discretion, or a showing that suit should be brought and that because of the trustees' conflict of interest, or some other reason, it is futile to make such a demand." *Velez v. Feinstein*, 87 A.D.2d 309, 315 (1st Dept. 1982).

There has been and can be no finding that Dalia, as Trustee of the Orly Trust, has failed to act on the Orly Trust's behalf. Indeed, Dalia, as Trustee of the Orly Trust, has commenced an action to declare that the Orly Trust is the beneficial owner of the TRI shares transferred by TPR. *Dalia Genger v. TR Investors, LLC et. al.* (Del. Ch. 6906-CS. filed Oct. 4, 2011). Exhibit B to Meister Aff.

The Delaware Supreme Court held that it did not have *in personam* jurisdiction over the Orly Genger Trust and therefore it could only determine that the Orly Trust was not the *record* owner of the TRI shares involved in the 2004 transfers, but did not determine whether the Orly Trust was the *beneficial* owner of these shares. *Genger v. TR Investors, LLC*, 592, 2010, 2011

11

WL 2802832 (Del. July 18, 2011). Accordingly, a judgment cannot be exercised by this court

regarding the beneficial ownership of the TRI Shares that were transferred to the Orly Trust

pursuant to the Divorce Stipulation without joining the Orly Trust as a party since by the transfer

to which TPR agreed (Counterclaim Ex. B) the Orly Trust became the beneficial owner of over

19% of TRI's shares.[1]

"Joinder rules serve an important policy interest in guaranteeing that absent parties at

risk of prejudice will not be 'embarrassed by judgments purporting to bind their rights or

interests where they have had no opportunity to be heard'". *Red Hook/Gowanus Chamber of*

*Commerce v. New York City Bd. of Standards & Appeals,* 5 N.Y.3d 452, 457-60, 839 N.E.2d 878

(2005) *quoting First Natl. Bank of Amsterdam v. Shuler,* 153 N.Y. 163, 170, 47 N.E. 262 (1897).

"They also protect against multiple lawsuits and inconsistent judgments." *Id.* (citation omitted).

Here the judgment seeks to impose a constructive trust in favor of Arie on the Orly

Trust's portion of the TRI shares that TPR transferred to the Orly Trust. Thus the failure to join

the Orly Trust would prejudice the rights of the Trust to retain the benefits of the 2004

transactions and would lead to an incomplete resolution of justice. The Delaware Supreme Court

agreed noting that "[s]uch an adjudication of beneficial ownership can occur only by a court with

personal jurisdiction over all indispensable parties. The federal court in the New York litigation

would be such a court." *Genger v. TR Investors, LLC,* 592, 2010, 2011 WL 2802832 (Del. July

18, 2011). Further, it is important to note that an action is pending in the Delaware Chancery

Court to declare that the Orly Trust is the beneficial ownership of the TRI, allowing for a full

---

[1]    This is a matter of substantial significance, as under the valuation determined by Justice Milonas, those
shares would be worth at least $10.3 million. The purported purchasers of those shares pursuant to agreement with
TPR (Counterclaim Exs. F and G) have paid $10.3 into escrow, which is now the subject of an interpleader action,
*Pedowitz & Meister LLP v. TPR Investment Associates, Inc. et al.,* U.D.S.D., S.D.N.Y., 11 civ. 1502 (JFK). And the
Orly Trust has filed an action in Delaware Chancery Court seeking a determination that the Orly Trust is the
beneficial owner of those TRI shares. *Dalia Genger, Trustee v. TR Investors, LLC et al.,* Del. Chanc. 6906-CS.

12

adjudication of beneficial ownership of the TRI shares. *Dalia Genger v. TR Investors, LLC et. al.* (Del. Ch. 6906-CS. filed Oct. 4, 2011). Exhibit B to Meister Aff.

**IV      As Dalia Does Not Own Any Shares of TRI Stock, No Injunction or Declaratory Judgment Preventing Her from Encumbering These Shares Is Inappropriate.**

Dalia was not given any shares of TRI Stock pursuant to the 2004 Transfers, and nowhere in Arie's pleading does he allege that Dalia owns any shares of TRI Stock. Thus Dalia has no corpus over which to impose a constructive trust, and neither has she been unjustly enriched. Thus those claims against her must be dismissed.

**V       Arie Is Not Entitled to <u>Any</u> Equitable Remedy As He Has Unclean Hands.**

Reformation, rescission, and imposition of a constructive trust  are an equitable remedies that should be denied on the basis of unclean hands.   Reliance upon the doctrine of unclean hands is applicable "when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct". *Citibank, N.A. v. Am. Banana Co., Inc.,* 50 A.D.3d 593, 594, 856 N.Y.S.2d 600, 601 (1st Dept. 2008) *(citation omitted).*  This is premised on the "equitable rule or maxim that 'he who comes into equity must come with clean hands.'" *Nat'l Distillers & Chem. Corp. v. Seyopp Corp.,* 17 N.Y.2d 12, 15, 214 N.E.2d 361, 362 (1966) (citation omitted). "To charge a party with unclean hands, it must be shown that said party was 'guilty of immoral or unconscionable conduct directly related to the subject matter'". *Id. (citation omitted).*

The clean hands doctrine is applicable when the defendant shows that the "plaintiff was guilty of immoral or unconscionable conduct when the agreement was made," the conduct complained of is directly related to the subject matter in litigation, and the party invoking the doctrine was injured by such conduct. *390 W. End Associates v. Baron,* 274 A.D.2d 330, 332, 711 N.Y.S.2d 176, 178 (1st Dept. 2000).

13

Here the Delaware Chancery Court concluded that Arie committed a "serious, secretive contractual breach". *TR Investors, LLC v. Genger*, CIV.A. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010) *aff'd*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011). The Delaware Supreme Court concluded that Arie "knew" during 2004 when he made his Divorce Settlement Agreement with Dalia that when he represented that no consent other than TPR was necessary to transfer ownerships of the TRI stock, "[t]hat representation was false". *Genger v. TR Investors, LLC*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011). Additionally, Justice Milonas concluded in his 2008 arbitration award that Arie had made false misrepresentations to Dalia in 2004 by representing in the divorce proceedings that the TRI shares had no value. Aribitration Award Meister Aff. Ex. A, p. 8 (finding that Arie's contention that his personal liabilities based on TRI's involvement with the Bogalusa litigation were "significantly misleading" as his exposure "if at all, was minimal.") "[W]hile equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) *quoting Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806, 814-15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (quotation marks and citation omitted).

Typically courts bar a plaintiff from seeking equitable remedies based on plaintiff's "unclean hands" when they have committed "perjury and fraud on the court." *Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 364 (S.D.N.Y. 2008)(Keenan, J.) (citation omitted). *See e.g., Goldstein v. Delgratia Mining Corp.,* 176 F.R.D. 454, 458 (S.D.N.Y.1997) (enforcing unclean hands defense where plaintiff made multiple misrepresentations to the court regarding law and facts); *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,* 792 F.Supp.

14

969, 970 (S.D.N.Y. 1992) (enforcing unclean hands defense where defendant company's

president fabricated testimony). The Delaware Chancery Court found that Arie committed an

"intentional violation of a clear judicial order and contempt of [the Delaware Chancery] [C]ourt"

*TR Investors, LLC v. Genger*, CIV.A. 3994-VCS, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009)

*aff'd*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011). Accordingly, due to Arie's deception

that ran contrary to a court order, Arie's claims in this litigation must be barred in equity. *See*

*also Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir.1983) ("[T]he defense of

unclean hands applies only with respect to the right in suit."). Further, "[t]he unclean hands

defense is not an automatic or absolute bar to relief; it is only one of the factors the court must

consider when deciding whether to exercise its discretion and grant an injunction." 11A Wright,

Miller, Kane, *Federal Practice and Procedure: Civil 2d* § 2946, at 111. "The doctrine of unclean

hands also may be relaxed if defendant has been guilty of misconduct that is more

unconscionable than that committed by plaintiff." *Id.* § 2946, at 112.

## VI   Arie's Fourth Cause of Action Seeking Unjust Enrichment and Rescission Should Be Dismissed.

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the

law creates in the *absence of any agreement.*" *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561,

572, 841 N.E.2d 742, 746-47 (2005)(emphasis added). Here "there was no unjust enrichment

because the matter is controlled by contract." *Id.*

Where the cause of action "arise[s] out of [a] subject matter covered by express

contracts" a claim for unjust enrichment should be dismissed. *Dabrowski v. Abax Inc.*, 64

A.D.3d 426, 427, 882 N.Y.S.2d 119, 120 (1st Dept. 2009) (dismissing plaintiffs quantum meruit

and unjust enrichment causes of action because the subjects at issue are addressed in express

contracts and the validity of the contracts are not in dispute). Here, Arie has not made

15

allegations sufficient to show that the written Divorce Settlement Agreement should be deemed invalid for any reason. The Divorce Stipulation was entered into by two parties that were represented by "separate, independent legal counsel" who "had full knowledge of the negotiation and terms of the Stipulation of Settlement at the time the Stipulation of Settlement was executed." (Compl. ¶¶ 39, 43). The Delaware Supreme Court concluded that Arie *knew* that the 2004 transfers were invalid at the time the Stipulation was executed, therefore any claim based on his mistake of fact to this regard is entirely without merit and constitutes a fraud on this court.

Likewise, there is no claim for rescission. As noted above, there was no mutual mistake of fact. "A court will not rescind an instrument for which the consideration was allegedly inadequate absent evidence of an additional circumstance warranting cancellation, such as fraud, duress, overreaching or unconscionability." *See* 16 N.Y. Jur. 2d Cancellation of Instruments § 15. Further, it was determined that Arie had *knowledge* in 2004, at the time the Divorce Settlement Agreement was executed, that his representation about all necessary consents having been obtained was false and Arie is collaterally estopped to contend otherwise. *See Genger v. TR Investors, LLC*, 592, 2010, 2011 WL 2802832 (Del. July 18, 2011). Arie is not entitled to cancellation of his Divorce Settlement Agreement based on any equitable theory. The only fraud committed in this action were the frauds that Arie committed himself when his falsely stated that TRI stock had no value and when he misrepresented that no further consent other than TPR was needed to transfer the shares of TRI stock in the 2004 Divorce Settlement Agreement.

**VII    The Fifth Cause of Action for a Permanent Injunction should be Dismissed**

The Fifth claim seeks an injunction, but pleads no new facts. Injunction is a remedy, not a claim. Here Arie has not shown that he is entitled to relief based on any theory. The only injuries that have occurred have been at the hands of Arie, who made these misrepresentations at the center of this litigation.

16

# CONCLUSION

For the foregoing reasons, the claims asserted against defendant Dalia Genger should be dismissed.

PEDOWITZ & MEISTER LLP

October 14, 2011

By
Robert A. Meister
Marisa Warren
1501 Broadway, Suite 800
New York, NY 10036
212.403.7330
Robert.meister@pedowitzmeister.com
   Attorneys for Dalia Genger

17

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of                        AMENDED ANSWER OF
ORLY GENGER, as a person interested, for the              DALIA GENGER TO
removal of DALIA GENGER as Trustee of the                 THIRD AMENDED PETITION
Orly Genger 1993 Trust pursuant to SCPA §711(11)          AND CROSS-PETTION
                                                          File No. 0017/~~2009~~
- - - - - - - - - - - - - - - - - - - - - - - - x                  *2008*

## AMENDED ANSWER

Respondent Dalia Genger, by her attorneys, answers the Third Amended Petition (the "Petition") as follows:

1.      Denies.

2.      Admits, except deny knowledge or information as to specific date of appointment.

3.      Refers to the Orly Trust Agreement for the true and correct contents thereof, and otherwise denies the first sentence.  Admit the second and third sentences.

4.      Paragraph 4 states a legal request to which no response is warranted.

5.      Admits that Dalia is Petitioner's mother and the sole Trustee of the Orly Trust, and denies the remaining allegations.

6.      Denies.

7.      Denies.

8.      Denies.

9.      Denies.

10.     Denies.

11.     Denies.

12.     Denies.

13.     Denies.

New York County Surrogate's Court
MISCELLANEOUS DEPT.

AUG 2 2 2017

FILED

Clerk_____

14.     Admits the first two sentences.  Denies knowledge or information as to the third sentence.

15.     Denies the first four sentences.  Denies knowledge or information as to the fifth sentence.

16.     Admits.

17.     Denies.  Avers that Petitioner has previously admitted that "the Note was always intended to be repaid by the family."

18.     Refers to the referenced Note and Pledge Agreement for the true and correct contents thereof, and otherwise denies the allegations.

19.     Denies knowledge or information.

20.     Admits the first sentence.  Denies the second sentence.

21.     Admits the first sentence.  Denies knowledge or information as to the second sentence.

22.     Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

23.     Admits the first four sentences.  Avers that the last sentence states a legal conclusion to which no response is warranted.  Refers to the referenced Agreement, and otherwise denies the allegations.

24.     Refers to the referenced Shareholders Agreement for the true and correct contents thereof, and otherwise denies the allegations.

25.     Denies.

26.     Denies.

27.     Refers to the referenced Resolution for the true and correct contents thereof, and otherwise denies the allegations.

28.     Denies.

29.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

30.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

31.     Refers to the referenced Arbitration transcript for the true and correct contents thereof, and otherwise denies the allegations.

32.     Refers to the referenced Arbitration transcript for the true and correct contents thereof, and otherwise denies the allegations.

33.     Refers to the referenced Memorandum for the true and correct contents thereof, and otherwise denies the allegations.

34.     Refers to the referenced Arbitration Award for the true and correct contents thereof, and otherwise denies the allegations.

35.     Denies.

36.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

37.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

38.     Denies.

39.     Denies knowledge or information as to the first sentence.  Denies the remaining allegations.

40.     Denies.

41.     Refers to the referenced Application for the true and correct contents thereof, and otherwise denies the allegations.

42.     Refers to the referenced Court decision for the true and correct contents thereof, and otherwise denies the allegations.

43.     Denies.

44.     Denies.

45.     Denies.

46.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

47.     Denies.

48.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

49.     Refers to the referenced Agreement for the true and correct contents thereof, and otherwise denies the allegations.

50.     Denies.

51.     Admits the first sentence.  Denies knowledge or information as to the remaining allegations.

52.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

53.     Denies.

54.     Refers to the Court records for the true and correct contents thereof, and otherwise denies the allegations.

55.     Refers to the referenced Court decision for the true and correct contents thereof, and otherwise denies the allegations.

56.     Refers to the referenced Demand for the true and correct contents thereof, and otherwise denies the allegations.

57.     Refers to the referenced Letter for the true and correct contents thereof, and otherwise denies the allegations.

58.     Denies, and refers to Justice Feinman's decision construing the Arbitration Award.

59.     Denies.

60.     Denies.

61.     Denies.

62.     Denies.

63.     Denies.

64.     Denies.

65.     Denies.

66.     Refers to the referenced Complaint for the true and correct contents thereof, and otherwise denies the allegations.

67.     Refers to the referenced Petition for the true and correct contents thereof, and otherwise denies the allegations.

68.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

69.     Refers to the referenced Court transcript for the true and correct contents thereof, and otherwise denies the allegations.

70.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

71.     Refers to the referenced Petition for the true and correct contents thereof, and otherwise denies the allegations.

72.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

73.     Refers to the referenced Court order for the true and correct contents thereof, and otherwise denies the allegations.

74.     Denies.

75.     Denies.

76.     Denies.

77.     Denies.

78.     Denies.

79.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

80.     Denies.

81.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

82.     Refers to the referenced Promissory Note for the true and correct contents thereof, and otherwise denies the allegations.

83.     Refers to the referenced Forbearance Agreement for the true and correct contents thereof, and otherwise denies the allegations.

84.     Denies.

85.     Admits that the parties endeavored to settle the referenced New York TPR Action, and otherwise denies the allegations.

86.     Denies.

87.     Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

88.     Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

89.     Refers to the referenced Settlement Agreement for the true and correct contents thereof, and otherwise denies the allegations.

90.     Denies.

91.     Denies.

92.     Denies.

93.     Denies.

94.     Denies.

95.     Denies.

96.     Denies that Mr. Isaacson is not acquainted with any members of the Genger family, and denied knowledge or information as the balance of the allegations.

<u>AFFIRMATIVE DEFENSES</u>

1.      The claims are barred by Petitioner's unclean hands and culpable conduct.

2.      The claims are time-barred.

3.      The claims are barred by findings made by other courts, and by the doctrines of *res judicata*, collateral estoppel, and judicial estoppel.

4.      The claims are barred by illegality and public policy.

5.      The claims are barred by the statute of frauds and parol evidence rule.

## **CROSS-PETITION**

It is respectfully alleged:

### **The Parties**

1.   Respondent/Cross-Petitioner Dalia Genger ("Dalia"), resides and is domiciled at 200 E. 65th Street, in the City of New York, County of New York and State of New York.

2.   Dalia the Trustee of the Orly Genger 1993  Trust (the "Orly Trust").

3.   Petitioner/Cross-Respondent Orly Genger ("Orly") is the only non-contingent beneficiary of the Orly Trust.

### **Jurisdiction and Venue**

4.   This Court has subject matter jurisdiction pursuant to the Surrogate's Court Procedure Act, <u>inter alia</u>, SCPA 103(50), SCPA 207(1), and SCPA 209(6).

5.   Venue in this County is proper pursuant to, <u>inter alia</u>, SCPA 207(1).

### **The Orly Trust**

6.   On or around December 13, 1993, Arie Genger ("Arie") settled the Orly Trust pursuant to a written Trust Agreement executed by Arie, as Grantor, and the two prior Trustees,

Lawrence M. Small and Sash A. Spencer (the "Trust Agreement").

7. Pursuant to Article ELEVENTH, Section C of the Trust Agreement, all trust funds are to be held in the name of the Orly Trust, and no Orly Trust assets are to be used for the benefit of Orly's creditors (the "Trust Agreement Obligations").

## Orly Trust Derivative Litigation

8. In July 2010, Orly instituted a derivative action in the Supreme Court, New York County entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010, by which she brought claims "on behalf of the Orly Trust as the beneficiary of the Orly Trust" (the "Orly Trust Derivative Litigation"). The Complaint sought to assert claims for the Orly Trust's ownership in shares of stock in a company called Trans-Resources, Inc. ("TRI"). Orly later amended her pleading to assert claims against, inter alia, the purchasers of those TRI shares, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, and New TR Equity II, and TRI (collectively, the "Trump Group Entities").

9. On January 2, 2013, in the Orly Trust Derivative Litigation, Justice Jaffe of the Supreme Court, New York County adopted Orly's position that she "has legal standing to represent the Orly Trust" and "may act on behalf of the Orly Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there."

10. Earlier on in the same Orly Trust Derivative Litigation, Orly moved to restrain Dalia from pursuing what Orly characterized as a "duplicative" action as Trustee of the Orly Trust before the Delaware Chancery Court, by which Dalia was seeking a declaration of obtain ownership of the same TRI shares. According to Orly: "In the instant action …, I seek, among other things, the return of those [same] TRI Shares to the Orly Trust." Also according to Orly, Dalia's "contention that the Orly Trust is not a party to this action …

is meritless. Orly is prosecuting this action on behalf of the Orly Trust." The Supreme Court, New York County, agreed, restraining Dalia from pursuing the action in the Delaware Chancery Court by which the Orly Trust had sought the TRI shares.

11. As a derivative plaintiff for the Orly Trust, having prevented the "duplicative litigation" brought by Dalia on behalf of the Orly Trust, Orly became the de facto trustee of the Orly Trust and owed fiduciary duties to the Orly Trust.

**Discontinuance With Prejudice of<br>The Orly Trust Claims**

12. In June 2013, Orly disclosed that she had "entered into a confidential settlement agreement to resolve all issues among the stipulating parties," which included the Trump Group Entities. However, the settlement terms were left undisclosed. Dalia sought production of the settlement agreement, but Orly refused to produce it, claiming the document was too "confidential." When it was proposed that the document be produced under "Attorney's Eye's Only" limitation, Orly refused that proposal as well. Instead, Orly submitted the Settlement Agreement to Justice Jaffe, unsolicited, for in camera inspection.

13. By letter dated June 28, 2013, counsel to the Trump Group Entities wrote to the Court on behalf of all settling parties "including ... Orly Genger" confirming that: "A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group [Entities], contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not

what the Trump Group [Entities] bargained and paid for in the settlement . . ."

14. Neither Orly nor any of the other settling parties disagreed with counsel's statements regarding the scope of the settlement.  Accordingly, on July 1, 2013, Justice Jaffe signed the requested Stipulation and Order of Discontinuance with Prejudice.

## The Trump Group Entities Settlement Agreement

15. Months later, as part of a parallel proceeding, the United States District Court directed Orly to produce her settlement agreement with the Trump Group Entities (the "Trump Group Entities Settlement Agreement").   The document revealed that Orly had settled her claims against the Trump Group Entities both "in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust" – the latter being the very capacity by which the Supreme Court permitted Orly to assert derivative claims.  According to its signatories, the purpose of the agreement was "to resolve all issues, disputes and disagreements between [Orly and the other Settling Parties], including but not limited to the issue of ownership of all [TRI] shares," most significantly those TRI shares claimed by the Orly Trust.

16. In exchange, the Trump Group Entities agreed to pay $32.3 million to the so-called "AG Group," consisting of Orly, her father Arie, and Arnold and David Broser (collectively, "the Brosers").  Upon information and belief, the Brosers are creditors of Orly personally, to whom Orly owes many millions of dollars.  The payments were broken up into: (a) an immediate payment of $17.3 million and (b) two follow-up payments of $7.5 million. According to the federal court, which reviewed the document, "Orly monetized her beneficial interest in the Orly Trust['s]  [TRI] shares for $32.3 million ...."

17. The Trump Group Entities have since reaffirmed that the federal court construed the

-11-

Trump Group Entities Settlement Agreement correctly:

> [Any suggestion] that the confidential settlement agreement *might* only dismiss Orly's individual claims against the Trump Group [Entities], but not resolve the Orly Trust's claims against the Trump Group [Entities] and the TPR Group . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. ... In settling the claims among them, the Trump Group [Entities], Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

18. Evidencing this intent, in Section 6(a) of the Trump Group Entities Settlement Agreement, Orly settled and released all of her claims in the Trump Group Entities Settlement in both her derivative and individual capacities. (Orly releasing the Trumps "in all capacities.") In Section 8(a) thereof, Orly further agreed to "cause" the Orly Trust to do the same, which she later did, advising the Delaware Chancery Court that she favored dismissal of Petitioner's action on behalf of the Orly Trust. The case was dismissed.

### The Settlement Proceeds

19. Under applicable law, the proceeds of a settlement obtained in a derivative lawsuit belong to the direct plaintiff (in this case, the Orly Trust), not the derivative plaintiff (in this case, Orly personally). Nonetheless, to date, none of the aforementioned $32.3 million (the "Settlement Proceeds") has been remitted to the Orly Trust, nor have any of the settling parties indicated an intention to do so in the future.

20. At a hearing before Justice Jaffe on March 25, 2015, counsel to the Trump Group Entities confirmed that $17.3 million of the Settlement Proceeds has already been paid, but that $15 million remains to be paid, less possible "set-offs" and subject to possible

acceleration or extension of those payment dates.

21. In a recent brief, Orly has alleged that, to date, she has not personally received any of the Settlement Proceeds. If true, this means $17.3 million of the Settlement Proceeds has been paid to other members of the "AG Group," i.e., the Brosers and Arie (the "Initial Payment"). Orly has not disclosed the intended recipients of the remaining $15 million.

22. Consistent with her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations, Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust. However, Orly failed to comply with these duties and obligations. Orly breached her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations.

### Cross-Petitioner's Substitution Motion

23. In order to protect the rights of the Orly Trust, Dalia moved in the Supreme Court, New York County, for an order permitting her to substitute for Orly as plaintiff in the Orly Trust Derivative Litigation and compelling the settling parties to deposit the Settlement Proceeds into Court. Orly vigorously opposed Dalia's motion, on the ground, inter alia, that she is seeking to remove Dalia as Trustee of the Orly Trust. By Interim Order dated May 7, 2015, Justice Jaffe neither granted nor denied the motion, but rather held it in abeyance pending this Court's determination of Orly's Petition.

24. At the March 25, 2015 hearing on Dalia's motion, Justice Jaffe suggested it might already be too late to deposit the Initial Payment into Court, as the $17.3 million apparently has already been paid out to non-parties. ("it sounds like that ship has sailed"). Accordingly, Dalia brings this Cross- Petition seeking, inter alia: retention of Dalia as the only non-contingent Trustee of the Orly Trust; monetary damages for misappropriation of Orly

Trust assets; and turnover of the Settlement Proceeds for the Orly Trust, to the extent such funds are recoverable.

## Count I: Breach of Fiduciary Duty

25. The allegations contained in paragraphs 1 through 24 hereinbefore are realleged as if fully set forth herein.

26. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

27. Orly owed a fiduciary duty to the Orly Trust.

28. Consistent with her fiduciary duty to the Orly Trust, Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

29. Orly did not so do. Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

30. Orly's actions constitute a breach of fiduciary duty.

31. The Orly Trust has been injured by Orly's breach of her fiduciary duty to the Orly Trust in the amount of $32.3 million, plus statutory interest.

## Count II: Breach of Loyalty

32. The allegations contained in paragraphs 1 through 31 hereinbefore are realleged as if fully set forth herein.

33. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

34. Orly owed a duty of loyalty to the Orly Trust.

35. Consistent with her duty of loyalty to the Orly Trust, Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

36. Orly did not so do.   Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

37. Orly's actions constitute a breach of her duty of loyalty.

38. The Orly Trust has been injured by Orly's breach of her duty of loyalty to the Orly Trust in the amount of $32.3 million, plus statutory interest.

## **Count III: Turnover**

39. The allegations contained in paragraphs 1 through 38 hereinbefore are realleged as if fully set forth herein.

40. Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

41. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

42. Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

43. The Settlement Proceeds should be delivered to the Orly Trust.

44. Orly should be compelled to turn over to the Orly Trust all Settlement Proceeds in her possession, custody or control.

### Count IV: Accounting

45. The allegations contained in paragraphs 1 through 44 hereinbefore are realleged as if fully set forth herein.

46. Orly has never provided an accounting of the Settlement Proceeds, which are an asset of the Orly Trust.

47. As a matter of law and equity, Orly should provide an accounting of the Settlement Proceeds.

### Count V: Unjust Enrichment

48. The allegations contained in paragraphs 1 through 47 hereinbefore are realleged as if fully set forth herein.

49. Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets were to be used for the benefit of Orly's creditors.

50. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

51. Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

52. Orly's creditors received the Settlement Proceeds instead of the Orly Trust.

53. Orly received a benefit from the Settlement Proceeds which belong to the Orly Trust.

54. Orly received such benefit from the Settlement Proceeds at the expense of the Orly Trust.

55. Under principles of equity and good conscience, Orly must make restitution to the Orly Trust in the amount of $32.3 million, plus statutory interest.

### Count VI: Self-Dealing

56. The allegations contained in paragraphs 1 through 55 hereinbefore are realleged as if fully

set forth herein.

57. Because the Orly Trust Derivative Litigation was brought on behalf of the Orly Trust, the Settlement Proceeds therefrom belong to the Orly Trust.

58. Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

59. Orly did not so do.   Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

60. Orly's actions constitute self-dealing.

61. The Orly Trust has been injured by Orly's self-dealing in the amount of $32.3 million, plus statutory interest.

### Count VII: Successor Trustee

62. The allegations contained in paragraphs 1 through 61 hereinbefore are realleged as if fully set forth herein.

63. Upon information and belief, Orly is seeking to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

64. Orly should not be permitted to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

65. Pursuant to Article SEVENTH of the Trust Agreement, an outgoing Trustee has the power to name a successor Trustee.

66. If this Court removes Dalia as trustee of the Orly Trust, Dalia should be permitted to

exercise her power to name a successor Trustee.

### Count VII: Successor Trustee

67. The allegations contained in paragraphs 1 through 66 hereinbefore are realleged as if fully set forth herein.

68. Upon information and belief, Orly is seeking to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

69. Orly should not be permitted to have Dalia removed as Trustee and a new Trustee appointed who will not seek to recover the Settlement Proceeds on behalf of the Orly Trust.

70. Pursuant to Article SEVENTH of the Trust Agreement, an outgoing Trustee has the power to name a successor Trustee.

71. If this Court removes Dalia as trustee of the Orly Trust, Dalia should be permitted to exercise her power to name a successor Trustee.

72. If Dalia is not permitted to exercise her power to name a successor Trustee, this Court should name an objective third party Trustee choosen from an independent list.

### Interested Parties

73. The names and addresses of all persons, other than the Petitioner, interested in the obtaining a determination of the issues presented in this Petition, and all other persons interested in this proceeding who are required to be cited upon this application or concerning whom this Court is required to have information, are:

    (a)    The following who are of full age and sound mind or are corporations or associations:

-18-

ORLY GENGER
780 Greenwich Street, Apt. 4P
New York, New York 10014

Interest: Beneficiary and Petitioner, Cross-Respondent

SAGI GENGER 1993 TRUST
C/O John Dellaportas
Kelley Drye & Warren
101 Park Avenue
New York, New York

Interest: Contingent Remainderman

    (b)    The following who are persons under disability:
               Infants: None
               Others under a disability: None

    (c)    The following persons who are confined in prison: None
    (d)    The following persons whose names or whereabouts are unknown: None

74. There are no persons, corporations or associations other than those mentioned who are interested in this proceeding.

75. No previous application for this or similar relief has been made to this or any other court except:

    a.   Motion Seq. 42 (for payment into Court) in the Orly Trust Derivative Litigation, entitled <u>Arie Genger, et al. v. Sagi Genger, et al.</u>, Index No. 651089/2010 in New York Supreme Court, New York County. Motion Seq. 42 was held in abeyance by the Supreme Court pending a determination by this Court.

    b.  Petition before this Court filed June 14, 2016, citation not yet issued.

WHEREFORE, Petitioner requests the following relief:

a.    declaratory judgment that Dalia is, and will remain, the only non-contingent Trustee of the Orly Trust;

b.      damages in in the amount of $32.3 million, plus statutory interest;

c.      imposition of a constructive trust on the Settlement Proceeds;

d.      an order directing the delivery of the Settlement Proceeds to Dalia as Trustee of

the Orly Trust;

e.      an accounting of the Settlement Proceeds;

f.      if Dalia is removed as Trusee of the Orly Trust, then authorizing Dalia to name

the successor Trustee;

g.      if Dalia is removed as Trusee of the Orly Trust, then having the Court name a

third party successor Trustee from an independent list;  and

h.      such other relief as to the Court seems just and necessary.


Dated: New City, New York
       August 12, 2017

_____
           Judith Lisa Bachman, Esq.
           254 S. Main Street
           Suite 306
           New City, New York 10017
           (845) 639-3210
           *Counsel to Respondent Dalia Genger*

-20-

WHEREFORE, your Respondent prays that the foregoing relief be granted and such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
      August 12, 2017

                                                DALIA GENGER

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)          AFFIDAVIT OF SERVICE
                                                          File No. 0017/2009
- - - - - - - - - - - - - - - - - - - - - - - - - x

I, Judith Bachman, Esq., of 254 S. Main Street, Suite 306, New City, New York 10956, being
duly sworn, state that I am over the age of eighteen years and that on August 14, 2017, I caused
to be deposited a copy of the Amended Answer and Cross-Peition of Respondent, Dalia Genger,
herein, in a post office box regularly maintained by the U.S. Postal Service in the County of
Rockland, State of New York, addressed to:

> ORLY GENGER
> 780 Greenwich Street, Apt. 4P
> New York, New York 10014
>
> SAGI GENGER 1993 TRUST
> C/O John Dellaportas
> Kelley Drye & Warren
> 101 Park Avenue
> New York, New York
>
> Kasowitz, Benson, Torres & Freidman LLP
> 1633 Broadway
> New York, NY 10019

The envelopes was deposited postage paid by regular first class mail.  No mailing was returned
as undeliverable.

_____
Judith Bachman, Esq.

Sworn to before me this

21st day of August, 2017

_____
Notary Public

JOANNE REDDEN HOROWITZ
Notary Public, State of New York
No. 02HO5034709
Qualified in Rockland County
Commission Expires March 11, 2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her :  
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST, :         Index No. 651089/2010
                                                        (Jaffe, B. JSC)
                                                :

                    Plaintiffs,         :

                    -against-         :

SAGI GENGER, TPR INVESTMENT :  
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE :  
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA :  
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR :  
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH, :         NOTICE OF MOTION

                    Defendants.

-------------------------------------------------------------x

SAGI GENGER, individually and as assignee of :  
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC. :  

        Cross-Claimants, Counterclaimants, and :  
        Third-Party Claimants,

                    -against-         :

ARIE GENGER, ORLY GENGER, :  
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC, :  
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH, :  
TRANS-RESOURCES, INC., WILLIAM
DOWD, and THE ORLY GENGER 1993 TRUST, :  

        Cross-Claim, Counterclaim and/or :  
        Third-Party Defendants.

-------------------------------------------------------------x

PLEASE TAKE NOTICE THAT, upon the accompanying Affirmation of Judith Bachman, dated August 11, 2014, and the exhibits attached thereto, and upon all the pleadings and proceedings heretofore had herein, Defendant Dalia Genger, through her undersigned counsel will move this Court returnable at 60 Centre St., Motion Submission Part, Room 130 on September 30, 2014, at 9:30 a.m. or as soon thereafter as counsel can be heard for an order substituting Dalia Genger, as trustee, as plaintiff on Orly Genger's Trump Group claims and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court, and such further and other relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to CPLR 2214(b), answering papers, if any, must be served at least seven days prior to the return date of this motion.

Dated:  August 11, 2014, 2014
        New City, New York

                                        _____ /s/ _____
                                        Judith Lisa Bachman, Esq.
                                        Counsel for Defendant
                                        Dalia Genger, Trustee
                                        254 South Main Street, Suite 306
                                        New City, New York 10956
                                        845-639-3210

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In The Matter of DALIA GENGER, Trustee of     File No. 2008-0017/E
the ORLY GENGER 1993 TRUST,           :

                        Hon. Nora S. Anderson
                Petitioner,      :

     - against -                :

ORLY GENGER, ARIE GENGER,         :
GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I,   :
LLC, NEW TR EQUITY II, LLC, TRANS-
RESOURCES, INC., ARNOLD BROSER,    :
DAVID BROSER, JOHN DOES 1-20, and
JANE DOES 1-20,                :

               Respondents.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK     )
                        ) ss.:
COUNTY OF NEW YORK   )

        Julie M. Thaxton, being duly sworn, deposes and says:

        1.  That deponent is over eighteen years of age, not a party to the action

and is employed by Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036.

        2.  That on the 6th day of February 2018, deponent served a true copy of

the

- ***Notice of Motion,***

- ***Affirmation of John Boyle in Support of the TR Entities' Motion to Dismiss the Petition For Turnover of Trust Property and Other Relief*** *with the annexed Exhibits A-L,*

- ***Affirmation of Mark S. Hirsch in Support of Motion to Dismiss*** and

- ***Memorandum of Law in Support of the TR Entities' Motion to Dismiss the Petition for Turnover of Trust Property and Other Relief Filed on June 14, 2016, by Dalia Genger as Trustee of the Orly Genger 1993 Trust***

by Federal Express, overnight delivery upon:

> Judith Lisa Bachman, Esq.
> 254 S. Main Street, Suite 306
> New City, New York 10956
>
> Kelley Drye & Warren LLP
> John Dellaportas
> 101 Park Avenue
> New York, NY 10178
>
> Kasowitz Benson Torres LLP
> Michael Paul Bowen
> 1633 Broadway
> New York, NY 10019
>
> Steven Riker, Esq.
> One Grand Central Place, 46th Floor
> New York, NY 10165

Julie M. Thaxton

Sworn to before me this
6th day of February 2018.

Matthew Koenig
Notary Public, State of New York
Reg. No. 01KO6211943
Qualified in New York County
Commission Expires Sept. 23, 2021

2